# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39628**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Malik K. CRUMP**
Airman (E-2), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 10 November 2020

————————————

*Military Judge:* Jefferson B. Brown (motions); Matthew D. Talcott.

*Approved sentence:* Dishonorable discharge, confinement for 10 years, forfeiture of all pay and allowances, reduction to E-1, and a reprimand. Sentence adjudged 23 September 2018 by GCM convened at Joint Base San Antonio-Lackland, Texas.[1]

*For Appellant:* Captain Amanda E. Dermady, USAF; Mark C. Bruegger, Esquire.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Lieutenant Colonel Brian C. Mason, USAF; Major Jessica L. Delaney, USAF; Major Anne M. Delmare, USAF; Mary Ellen Payne, Esquire.

Before J. JOHNSON, LEWIS, and POSCH, *Appellate Military Judges*.

Senior Judge LEWIS delivered the opinion of the court, in which Chief Judge J. JOHNSON and Senior Judge POSCH joined.

————————————

---

[1] We use the arraignment and trial location as reflected in the authenticated record of trial. The court-martial order (CMO) states, contrary to the authenticated transcript, that arraignment occurred at Joint Base San Antonio-Fort Sam Houston, Texas. In our decretal paragraph, we order a correction to the CMO for an error in the trial court's findings but we do not order a modification to the arraignment location.

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

LEWIS, Senior Judge:

A general court-martial composed of a military judge sitting alone convicted Appellant, contrary to his pleas, of three specifications of sexual assault and one specification of abusive sexual contact in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920,[2,3] and one specification of assault consummated by a battery in violation of Article 128, UCMJ, 10 U.S.C. § 928.[4] The court-martial sentenced Appellant to a dishonorable discharge, confinement for ten years, forfeiture of all pay and allowances, reduction to the grade of E-1, and a reprimand. The convening authority approved the adjudged sentence but failed to include the reprimand of Appellant in the action as required by Rule for Courts-Martial (R.C.M.) 1107(f)(4)(G). *See also* R.C.M. 1003(b)(1). We take corrective action to remedy this error and do not approve the reprimand in our decretal paragraph.

Appellant raised 12 issues[5] for our consideration: (1) whether the evidence is legally and factually sufficient; (2) whether the military judge erred by not recusing himself; (3) whether the military judge erred by admitting testimony offered pursuant to Mil. R. Evid. 413; (4) whether the military judge erred by

———————————

[2] All references to the Uniform Code of Military Justice (UCMJ), Rules for Courts-Martial (R.C.M.), and Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2016 ed.) (*MCM*).

[3] The abusive sexual contact offense was charged as aggravated sexual contact, also a violation of Article 120, UCMJ. The military judge found Appellant guilty of the "lesser included offense" of abusive sexual contact. After the presentation of evidence, trial defense counsel agreed with the military judge that abusive sexual contact was a lesser included offense of aggravated sexual contact. Additionally, the finding of guilty to this specification was by exceptions and substitutions.

[4] Appellant initially pleaded guilty to assault consummated by a battery and the military judge found his plea provident and entered findings of guilty. This plea of guilty was later withdrawn. We describe the circumstances of that withdrawal when we assess Appellant's second assignment of error, whether the military judge erred by not recusing himself.

[5] We have reordered and reworded the assignments of error. Appellant personally raises issues (7), (8), (9), (10), and (11) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

failing to compel the production of evidence and witnesses from the investigation of the Mil. R. Evid. 413 witness's claims; (5) whether the military judge erred in excluding evidence under Mil. R. Evid. 412; (6) whether Appellant was denied effective assistance of counsel under the Sixth Amendment[6] as alleged in three deficiencies in the performance of his trial defense counsel; (7) whether Appellant was unlawfully deprived of a panel of his peers in violation of the Sixth Amendment and Article 25, UCMJ, 10 U.S.C. § 825; (8) whether trial defense counsel were ineffective on additional grounds by declining to search Appellant's phone or review the Snapchat messages he exchanged with one victim; (9) whether the military judge erred by considering an unsworn victim impact statement under R.C.M. 1001A; (10) whether the mandatory dishonorable discharge is unconstitutional; (11) whether the sentence to ten years of confinement was unduly severe; and (12) whether the cumulative error doctrine requires relief. In addition, although not raised by Appellant, we consider whether he is entitled to relief for facially unreasonable appellate delay.

With respect to issues (7), (8), (9), and (11), we have carefully considered Appellant's contentions and find they do not require further discussion or warrant relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

Regarding issue (10), we find the assignment of error to be without merit for the reasons we announced in three prior cases: *United States v. Rita*, ___ M.J. ___, No. ACM 39614, 2020 CCA LEXIS 238, at *5–7 (A.F. Ct. Crim. App 17 Jul. 2020), *rev. denied*, No. 20-0365, 2020 CAAF LEXIS 571 (C.A.A.F. 15 Oct. 2020); *United States v. Plourde*, No. ACM 39478, 2019 CCA LEXIS 488, at *45–49 (A.F. Ct. Crim. App. 6 Dec. 2019) (unpub. op.), *rev. denied*, 80 M.J. 73 (C.A.A.F. 2020); and *United States v. Yates*, No. ACM 39444, 2019 CCA LEXIS 391, at *71–73 (A.F. Ct. Crim. App. 30 Sep. 2019) (unpub. op.), *rev. denied*, 80 M.J. 80 (C.A.A.F. 2020).

On the remaining issues, we find no error that materially prejudiced Appellant's substantial rights. As assertions of error without merit are not sufficient to invoke the doctrine of cumulative error, we find no relief warranted for issue (12). *See United States v. Gray*, 51 M.J. 1, 61 (C.A.A.F. 1999). We affirm the findings and, except for the reprimand, the approved sentence.

## I. BACKGROUND

Appellant joined the Air Force in February 2017. After successfully completing basic military training, Appellant began technical training in a medical career field at Joint Base San-Antonio Fort Sam Houston, Texas. The charged offenses arose from two separate incidents in Appellant's dormitory room on

---

[6] U.S. CONST. amend. VI.

that installation. The first incident occurred in July 2017 and the second in November 2017. Each incident involved a different female Airman who lived in the same dormitory as Appellant and had visited his room. The incident in July involved Airman (Amn) MM and the incident in November involved Airman Basic (AB) EA.[7] We address the two incidents in that order.

## A. Airman MM

The military judge convicted Appellant of two offenses involving Amn MM: (1) abusive sexual contact, by causing bodily harm, when Appellant touched her hips through her clothing with an intent to gratify his sexual desire; and (2) assault consummated by a battery when he unlawfully struck her in the face with his hand. Both offenses occurred during the same visit to Appellant's room. Before describing the offenses, we address the prior interactions of Appellant and Amn MM before the day of the offenses.

### 1. Prior Interactions

Amn MM first met Appellant in May 2017 while hanging out at the dormitory where both lived. Later, Amn MM saw Appellant off-base when both were getting tattoos. At this point, the two exchanged phone numbers and then started texting each other and communicating over the social media application Snapchat. At first, the two were only friends, but over time they had consensual sexual intercourse—sometimes in his dormitory room and sometimes in hers.

Evidence of Amn MM's and Appellant's consensual sexual activities before the charged conduct was admitted, pursuant to Mil. R. Evid. 412, to show whether Appellant had a mistake of fact defense to the offenses. While there was general agreement that the prior sexual encounters occurred, Appellant and Amn MM disagreed on the specifics. Most notably, they disagreed about whether Appellant had been allowed to slap Amn MM on her face or on her buttocks during sexual intercourse.

Amn MM recalled Appellant weakly slapping her buttocks while they were having intercourse on two separate occasions. On the first occasion the slap was at her request. Afterwards, Amn MM joked with Appellant that he "hit like a bitch" because he hit her softly and the two laughed about it. Amn MM testified that Appellant slapped her buttocks one other time while they were having intercourse, even though she did not request it, but she was "okay" with him doing it.

---

[7] This opinion uses their grades as listed on the charge sheet. Both had been promoted by the time of their trial testimony.

Amn MM denied ever asking Appellant to hit her in the face during intercourse. Instead, she recalled a conversation with Appellant on this subject where he explained how an ex-girlfriend of his "loved for him to slap her in the face." Amn MM testified that her response to Appellant was "[w]ell that's all fine and dandy for her, but do not touch my face. I have personal issues with that; do not touch my face."

Appellant testified that he smacked Amn MM on the buttocks during intercourse but she had never asked him to do so. Instead, Appellant testified on a prior occasion Amn MM requested that he "smack her" while he was on top of her during sex and so he slapped her in the face "not very hard." According to Appellant, it was this slap that caused Amn MM to remark that he hit "like a bitch." Appellant denied having a prior conversation with Amn MM that her face was off-limits.

After the last time Amn MM and Appellant had consensual intercourse, Amn MM started a new relationship and subsequently told Appellant she did not want to have sex with him anymore. Appellant got upset and called Amn MM "a hoe." Amn MM stopped speaking with Appellant for almost two weeks. The charged offenses occurred when Appellant attempted to reconcile with Amn MM.

### 2. Abusive Sexual Contact and Battery of Amn MM

On 13 July 2017, Appellant messaged and texted Amn MM, asking for her to come to his room so he could apologize to her face-to-face for the name he called her. She agreed to visit his room but also messaged Appellant that she was not going to have sex with him. Upon entering Appellant's room, Amn MM noticed Appellant's roommate was not present. The door closed behind Amn MM after she entered.[8] Appellant, who was sitting on his bed, began apologizing. Amn MM replied "well, if that's all you have to say I'm leaving. I'm over it." At this point, Amn MM and Appellant have markedly different accounts about what happened next in Appellant's dormitory room. We begin with Amn MM's testimony and the evidence that supported her testimony.

#### a. Testimony of Amn MM and Supporting Evidence

After Amn MM told Appellant she was leaving, she recalled Appellant grabbing the front of her shirt and trying to pull her closer to where he was seated on the bed. She told him "no. Stop. Don't do that. Get off." Rather than stop, Appellant got up from the bed and tried to get behind Amn MM. She turned as he did and ended up with her back to his bed. With a hold of Amn MM's shirt, Appellant tried to push her backwards onto the bed multiple times. Each time,

---

[8] The record of trial contains a technical training student housing gender integration policy which required "[d]oors must remain fully open when a guest is inside."

Amn MM resisted and stood back up two or three times after Appellant would push her onto the bed. During this struggle, Appellant let go of Amn MM's shirt and began trying to take off her leggings by grabbing the side of her waistband at her hip area. She kept a grip on her leggings and "was not going to let them come off."

As Amn MM resisted, Appellant said "I don't know why you're playing with me. You need to stop. . . . I told you I was sorry." Appellant flipped Amn MM over so she now faced the bed with one forearm down on it while she held up her leggings with her other hand. Appellant, now behind her, tried again to pull her leggings down with his hands at the side of her waistband. Amn MM pushed off the bed with her forearm and was able to get up, turn, and face Appellant. She then pushed Appellant with her right hand. In response, Appellant said either "[d]on't [f]'ing hit me" or "[d]on't [f]'ing push me" and then hit Amn MM, open handed, on the left side of her face. Amn MM felt immediate pain and told Appellant to get away from her. Appellant backed away and Amn MM left immediately to go a friend's room, Airman First Class (A1C) AP.

A1C AP was not in her room, but at the gym. A1C AP saw that she missed a call from Amn MM and then saw a text message that Amn MM really needed to speak with her. When the two met at A1C AP's room, A1C AP could see Amn MM was distraught and crying hard. A red mark on Amn MM's left cheek was visible to A1C AP. Amn MM cried so hard for the first few minutes that she could not talk, something that A1C AP had never seen from her close friend. Amn MM then disclosed how Appellant had tried to get on top of her and touch her and when she pushed him off of her, he hit her in the face. Neither Amn MM nor A1C AP immediately reported Appellant to authorities.

When Amn MM went to school the next day, the place where Appellant hit her face showed bruising. Amn MM tried to cover it up with makeup, unsuccessfully. A prior service student noticed the injury and pulled Amn MM out of class and asked her what happened. In turn, instructors and investigators were notified. Photos of the bruising on Amn MM's face were taken two to three days after she was struck and later the following week. The photos were admitted into evidence.

### b. Appellant's Pretrial Statements

On 20 September 2017, agents from the Air Force Office of Special Investigations (AFOSI) interviewed Appellant. After a proper waiver of his rights under Article 31, UCMJ, 10 U.S.C. § 831, Appellant made oral and written statements. On 29 September 2017, a second interview was conducted after another rights advisement. Appellant made further oral statements and completed a second written statement. At trial, Special Agent (SA) PA, who had spent 24 years as an AFOSI special agent, testified to Appellant's pretrial statements.

Both written statements were admitted into evidence as prosecution exhibits and small portions of the recorded interviews were admitted into evidence.[9]

According to Appellant's first written statement, after he apologized to Amn MM for calling her a "hoe," she started to leave and he reached out for her hand and pulled her in. He stated they kissed and then rolled over on his bed to where he was on top. He then wrote the following:

> While kissing she moved her head away so I leaned in again to continue kissing. While kissing [Amn MM] mumbled something that I couldn't really hear. So noticing that kissing wasn't working to the point I needed I slapped her with my right hand onto her left cheek/eye.

Appellant's second written statement, clarified that when he was kissing Amn MM, she "pulled away." This was similar to an oral statement Appellant made that Amn MM had "started to squirm away a little bit." Appellant further clarified that he did not hit Amn MM because she mumbled something. He wrote, "[Amn MM] mumbled something I cannot remember. <u>NOT</u> in reaction to what she said I smacked her across the left side of her face."

In addition to these clarifications, Appellant provided a further written explanations for why he struck Amn MM:

> [j]ust to try and get her in the mood for sex. Knowing she liked it rough I tried to turn her on that way. Doing so was [completely] wrong. [There] were multiple signs I should [have] paid more attention to. I was caught in the heat of the moment, not realizing what was happening. I am in complete fault for my actions.
>
> . . .
>
> She moved away in a manner as if she wasn't interested and wanted to stop.

SA PA also testified to another inconsistency from Appellant's oral interview. First, Appellant told SA PA two different versions of how Amn MM reacted after he hit her. Initially, Appellant said Amn MM looked up at him almost in a "seductive" manner and they started kissing again. Subsequently, Appellant described Amn MM's reaction as "upset" or a "what are you doing[?]" look.

---

[9] While three excerpts were admitted, only one is transcribed in accordance with Air Force Manual 51–203, *Records of Trial*, ¶ 12.8 (4 Sep. 2018) ("Transcribe verbatim audio or video recordings introduced at trial."). We find no prejudice to Appellant from the failure to transcribe two of the recorded interview excerpts.

### c. Appellant's Trial Testimony

Appellant described his apology to Amn MM and testified that it led to subsequent consensual kissing on the bed where he ended up on top of her. Appellant testified that Amn MM did not protest the kissing and laying down on the bed "at the moment." After further kissing, Appellant recalled "[s]he jerks her head—not really jerks, but moves her head to the right side, I believe." He testified they kissed again for a minute or two before "[s]he pulls away and then mumbled something." Appellant explained he took her mumbling "as, '[s]trike me,' so I hit her—I smack her across the face."

On cross-examination, Appellant admitted that Amn MM had texted him beforehand that she was not going to have sex with him and that he initially denied this fact to the AFOSI agents. Appellant testified he "never tried to pull down" Amn MM's pants. While on the bed, Appellant admitted that Amn MM squirmed but he claimed that when Amn MM moved her head away that was the same thing as her squirming away. He explained "[w]hen she moved her head, her whole body moved. It wasn't just a head in motion because it would be kind of hard to do while laying down." Appellant asserted "[s]exual gratification was not on my mind."

### d. Trial Result

The military judge acquitted Appellant of aggravated sexual contact of Amn MM, but convicted him of abusive sexual contact by exceptions and substitutions. The military judge found that Appellant touched Amn MM's hips, rather than her legs, as was charged, through her clothing with an intent to gratify his sexual desire. The military judge convicted Appellant of assault consummated by a battery of Amn MM for unlawfully striking her face with his hand, as charged.

## B. AB EA

The military judge convicted Appellant, as charged, of three specifications of sexually assaulting AB EA by penetrating her vulva with his finger, tongue, and penis, without her consent. The military judge merged the three specifications for sentencing as the offenses occurred in close succession on a single visit by AB EA to Appellant's dormitory room.

We explain the interactions between AB EA and Appellant before the charged conduct before detailing their starkly different trial testimonies about what happened in Appellant's dormitory room. While explaining their prior interactions, we describe the perspective of two witnesses: (1) Appellant's then girlfriend and later wife, A1C PC,[10] and (2) AB EA's roommate, Amn AG.

---

[10] This opinion uses her grade and initials as of the trial date.

### 1. Prior Interactions

Appellant and AB EA met through mutual friends when she first arrived at technical training sometime after late July 2017. Subsequently, Appellant and AB EA shared the same "friend group" and often spent time together in a group setting. Of note, Amn MM was not a part of this friend group. AB EA and Amn MM did not know each other.

After AB EA and Appellant met, they exchanged phone numbers and communicated frequently on Snapchat. AB EA was married and did not spend any one-on-one time with Appellant, though she did visit his room once to "pop his back"[11] with Appellant's roommate present. AB EA and Appellant had no prior dating relationship and had not engaged in any sexual conduct with each other.

When asked at trial, AB EA testified that she considered Appellant "[s]omewhere between an acquaintance and a friend." However, AB EA agreed that she saw him every single day and may have told AFOSI agents and the sexual assault nurse examiner (SANE) that he was a close friend. AB EA's roommate, Amn AG, described their friend group as "we were all good friends." AB EA testified that she knew Appellant and A1C PC were dating and on the date of the offense it was "possible" that she already knew they were married.

Appellant considered AB EA a close friend and testified they once had a Snapchat "streak" where they communicated on the application every day for roughly 38 to 42 days straight. Appellant trusted AB EA and on one occasion lent his car to her so Amn EA and Amn AG could go get some food. Another time, AB EA invited Appellant to Amn AG's birthday party, but Appellant's then girlfriend, A1C PC, was not invited.

A1C PC testified that Appellant and AB EA were close friends. A1C PC characterized her own relationship with AB EA as "cordial" but recalled feeling "[u]ncomfortable" when A1C PC was not invited to Amn AG's birthday party. A1C PC conceded that she was not friends with Amn AG but she did not like that only Appellant was invited to the party because it was known that A1C PC and Appellant were dating. On 1 November 2017, A1C PC completed technical training and departed for her first assignment at an installation outside Texas.

---

[11] AB EA explained that she learned how to pop someone's back as a school sports trainer and that it required "someone to lay out on their stomach with the arms on their side while I do a manipulation with my hands on their spine." AB EA also noted that it was not necessary to remove any clothing.

### 2. Sexual Assault of AB EA

#### a. AB EA's Trial Testimony

On 7 November 2017, Appellant and AB EA messaged on Snapchat and she agreed to visit his room to "pop his back." AB EA arrived between 1400 and 1500 hours and saw Appellant's roommate leaving. Another female Airman that AB EA knew of, but had never spoken to, saw AB EA in the hallway.

When AB EA knocked on his door, Appellant answered wearing "underwear" but no shirt. AB EA thought it was "kind of" odd that Appellant answered the door as he did but she did not give it much thought. She explained that Appellant "is a free spirit" which she described as "nonchalant" and "kind of carefree." After AB EA entered the room Appellant shut his door telling AB EA that his music was too loud.

Soon after, Appellant began trying to convince AB EA to kiss him. AB EA told Appellant that she did not want to kiss him and turned her head away when he tried. She also told him that was not why she was there. Appellant replied that there was a "connection" between them and they did not have to fight it anymore. AB EA told Appellant that his statement about a connection between them was "false." At this point, AB EA was not concerned because she thought she could handle Appellant's attempts to kiss her.

Appellant then began to feel AB EA's vaginal area over her shorts. AB EA told him to stop and backed away from him going further into the room. Appellant then tried to pull down her shorts with one hand but she pulled them back up. Appellant then used both hands and succeeded in pulling her shorts down leaving her underwear on. Appellant then moved her underwear to the side and began to "aggressively finger" her "hard and fast." AB EA told Appellant to stop again and that he was hurting her as he penetrated her vagina with his finger.

AB EA kept backing up and the two reached Appellant's bed where AB EA ended up on her back on the bed. While still standing, Appellant removed her underwear and continued to penetrate her vaginally with his fingers. AB EA told him to stop. Instead, Appellant pulled down his pants and while standing penetrated AB EA vaginally with his penis. Appellant told AB EA to "quit fighting it" and that he "knew that [she] wanted him." AB EA propped herself up on her arms and began to back up to where "two walls met" in a corner behind the bed. Appellant got on the bed, on his knees, and continued to penetrate her vaginally with his penis. AB EA tried to push away from the wall but Appellant continued and this threw her back into the corner of the two walls.

At some point, Appellant slowed down and told AB EA to turn over. She refused so he stopped penetrating her and tried to turn her over. He was only partially successful which left AB EA at an awkward angle on her side. When

AB EA tried to turn onto her back Appellant used his forearm to press down against her shoulder area. Appellant penetrated AB EA vaginally again with his penis and she again told him to stop and that she did not want to do this. Appellant replied that she was "already doing this." This comment made AB EA mad and she "clawed" Appellant's right arm with her left hand. Appellant did not respond to being clawed.

Eventually Appellant told AB EA that he was going to grab a condom and retrieved one from the nightstand next to his bed and put it on. Appellant tried unsuccessfully to penetrate AB EA vaginally again. At one point, AB EA heard a pop noise and Appellant said "I hate condoms." Appellant then put his head between AB EA's legs and penetrated her vagina with his tongue only for a few seconds before she "crushed his head" with her legs. Appellant resumed trying to penetrate her vaginally with his penis and was again unsuccessful. He then reached for a bottle of lubricant from his nightstand. At this point, AB EA began hysterically crying and telling him to stop. According to AB EA "I guess [he] came to his senses that I was genuinely upset, so he backed off."

As AB EA searched for her clothes, Appellant went to the bathroom and flushed the condom down the toilet. Once dressed, AB EA headed for the door just as Appellant came out of the bathroom. Appellant said "[d]on't tell [A1C PC]." AB EA replied either "I won't" or "I wouldn't." AB EA headed immediately back to her room.

### b. Disclosure to Amn AG and Amn KC

When AB EA returned to her room, her roommate, Amn AG, was in the shower. Amn AG heard the door to their room slam over the sound of the shower. Amn AG heard AB EA crying, described as "wailing," through the bathroom door and over the sound of the shower. Amn AG turned off the shower and quickly exited the bathroom.

A second friend, Amn KC, was also in AB EA's room when AB EA returned. Amn KC had fallen asleep on Amn AG's bed while watching Netflix. Amn KC recalled "I heard a noise, which is what woke me up, and then it was [AB EA] crying" and "trying not to look at me." Amn KC described AB EA as "crying uncontrollably" and unable to speak. AB EA would "try to get words out, but it just made her cry harder."

Once Amn AG exited the bathroom, she saw Amn KC holding and comforting Amn EA on Amn AG's bed. Amn AG got dressed as fast as she could and joined the other two on her bed. Amn AG recalled AB EA "crying to the point where she could barely get words out" with her hands on her face. Amn AG and Amn KC "were just holding" AB EA. Amn AG recalled AB EA crying for 15 to 20 minutes where all she could say was "I can't tell you." During this time,

Amn AG reassured AB EA that "it's okay, you can tell us" and AB EA eventually said Appellant "wouldn't stop" and then explained to her friends what happened.

AB EA told her friends that she "felt gross and wanted to shower." At first, Amn AG said "okay. Great idea. Like get a shower and feel better." As Amn AG started walking towards the shower she reconsidered and said "wait" and explained that if AB EA "wanted to have a decision [to report], if she went in the shower she wouldn't have as much evidence for herself to make that decision." Amn AG asked AB EA, "[C]an you trust me[?] Can we just take a minute?" Amn AG continued, "[Y]ou don't have to decide anything right now, but can we pause on the shower and maybe go speak to the chaplain? That way you have a choice; you know, unrestricted or restricted." AB EA said, "[O]kay."

Amn KC led the three downstairs to visit the chaplain with AB EA in the middle and Amn AG walking behind AB EA. They walked in this order in case they ran into Appellant or anybody who tried to talk to AB EA. Once at the chaplain's office, Amn KC recalled AB EA "didn't really speak all that much; [s]he was still crying. And then [Amn AG] kind of told him, 'hey, my friend was just raped. We weren't really sure what to do. What's our next step[?]" In response, the chaplain called the sexual assault response coordinator's number, handed AB EA the phone, and left the room. AB EA was connected to a victim advocate who later met AB EA at the hospital for a sexual assault forensic examination (SAFE). Amn AG drove AB EA to the hospital and Amn KC accompanied them. On the drive to the hospital, AB EA called her mother and told her what happened.

### c. SAFE

On arrival at the hospital, AB EA's report was still restricted, which meant that no law enforcement agency was involved. Nurse MJ, a certified SANE who had performed about 300 examinations, obtained AB EA's consent to perform the SAFE and obtained a narrative description from AB EA. The narrative was typed, signed by Nurse MJ, and attached to her report which was admitted into evidence. Regarding what happened in Appellant's room, the narrative is largely consistent with AB EA's recollections at trial. Of note, the narrative said AB EA scratched and clawed Appellant's arm.

There are some minor differences between what Nurse MJ wrote in the narrative and AB EA's trial testimony. We mention three of them which are representative of how minor the differences were. First, Nurse MJ wrote that AB EA and Appellant "were close friends" rather than between an acquaintance and a friend. Second, in describing the oral sex Appellant performed on AB EA, Nurse MJ wrote that Appellant was "trying to give [AB EA] oral [sex],

[AB EA] guess[ed] for lubrication. That didn't last very long." Nurse MJ's narrative did not mention that AB EA crushed Appellant's head after he started to perform oral sex on her. Third, regarding their positioning on the bed, Nurse MJ wrote that AB EA "hit the wall and had nowhere to go." However, Nurse MJ's narrative did not mention that when Appellant "kept penetrating [AB EA]" it was "throwing [AB EA] back into the wall."

During the physical examination of AB EA, Nurse MJ collected a vaginal swab, fingernail scrapings, and hand swabs. Nurse MJ noted where AB EA reported pain during the examination and took photographs which were admitted into evidence. Particularly, Nurse MJ reported seeing "really bright red" blood that was "mucusy" in the cervical orifice so she "cleaned that blood out and it revealed redness[12] at the os, which is the opening." Nurse MJ could not positively say "without a shadow of a doubt" that the blood she cleaned away was not menstrual blood. However, Nurse MJ noted "a lot of tenderness in that area" and "acute pain" during swabbing.

Nurse MJ photographed and noted in her report a "2x2 cm purple bruise and abrasion" on AB EA's mid-lumbar region, "just right of the spine." Nurse MJ also photographed and noted in her report that there was "3 cm re linear scratch under [AB EA's] right scapula." AB EA related that she did not know the cause of either injury.

### d. Investigation

Initially, AB EA did not want to make an unrestricted report. AB EA explained at trial that her reasons included the "close knit friend group" that she shared with Appellant and because she wanted to avoid testifying at a trial. However, the next day, 8 November 2017, AB EA made an unrestricted report and the sexual assault response coordinator notified AFOSI. SA PA, who was the lead investigator in the case involving Amn MM, assisted in the initial steps of Appellant's investigation involving AB EA.

SA PA interviewed AB EA's victim advocate who provided initial details of AB EA's SAFE and the narrative AB EA provided. Search authority was obtained for Appellant's dormitory room. Condoms and lubricant were seized

---

[12] An expert SANE testifying for the Defense opined, from the photos taken by Nurse MJ, that the redness in AB EA's cervix opening was indicative of a medical condition, an ectropian cervix. The Defense's expert noted that symptoms of an ectropian cervix after intercourse can be pain, a "little bit of bleeding," and a "mucous discharge." While Nurse MJ had never personally seen this medical condition in her SAFEs, she was aware of the condition and its description. Based on her examination, Nurse MJ disagreed with the opinion of the Defense's expert that AB EA's cervix was ectropian.

from Appellant's nightstand next to his bed. His room was photographed and seven of those photos were later admitted into evidence. The search authorization also included a SAFE for Appellant, conducted by Nurse MJ, while the AFOSI agents waited outside the examining room.[13]

Nurse MJ collected standard specimens from Appellant which included a saliva sample, buccal swabs, and penile swabs. Nurse MJ photographed Appellant's upper right arm which had "abrasions or scratches" on it. At trial, Nurse MJ described them as "scattered scratches" which were "by the shoulder and bicep area. They're just linear, coming downward." Nurse MJ noted there was redness and inflammation on the scratches which she described as "fairly new." Nurse MJ asked Appellant where he got the scratches and he replied, "I was scratched during football."

On 9 November 2017, AFOSI agents interviewed AB EA with her victim advocate and special victims' counsel present. After this interview, AB EA agreed to call Appellant while AFOSI agents recorded the call. AB EA began the call by telling Appellant that she received a text message from A1C PC, Appellant's spouse, which was a ruse. Appellant replied, "I'm not supposed to be talking to you right now." AB EA asked why A1C PC texted her and Appellant said, "I told her what happened. I'm under investigation. I'm not living in the dorm any more. I'm already going to go to jail for what happened. I'm not supposed to be talking to you because everything that happened shouldn't have happened." When AB EA asked what Appellant told A1C PC, he responded "I'm not supposed to be talking to you right now. I have to go before I get in more trouble." AB EA told Appellant it was okay and he replied "I'm sorry. No, I don't want to get in more trouble. I'm not trying to get in any more trouble, okay. I'm sorry. I've got to go." Appellant made no additional statements to AFOSI agents about the incident with AB EA.

The samples collected from the SAFEs of AB EA and Appellant were sent to the United States Army Criminal Investigations Laboratory (USACIL) for analysis. At trial, a forensic biologist, Ms. MC, testified to the results in four parts.

First, semen was found on AB EA's vaginal swab. Ms. MC performed additional DNA testing on the vaginal swab, found DNA, and Appellant was included on the DNA profile.[14] Ms. MC's findings were "[t]he DNA profile is at

---

[13] Nurse MJ's report also includes the written "Consent for Evidence Collection and Release" signed by Appellant.

[14] Ms. MC explained that she used autosomal STR testing, the most discriminating type of testing that she can do. Autosomal testing involves looking at the short tandem

least one quintillion times more likely if [Appellant] is included as a contributor than if he is not."

Second, Ms. MC conducted DNA testing on Appellant's penile swab. AB EA was included in the DNA profile. Ms. MC's findings were "[t]he DNA profile is at least one quintillion times more likely if it originated from [Appellant] and [AB EA] than if it originated from [Appellant] and an unknown individual."

Third, Ms. MC conducted DNA testing on AB EA's hand swabs.[15] Her findings were "[t]he DNA profile from the hand swabs is at least one quintillion times more likely if it originated from [AB EA] and [Appellant] than if it originated with [AB EA] and an unknown individual."

Fourth, Ms. MC used a different method, Y STR DNA testing,[16] on AB EA's fingernail scrapings. Ms. MC found a mixture of two male individuals. Ms. MC was "not able to exclude Appellant or his paternal male relatives from the major DNA profile," which contributed more DNA to the sample. Ms. MC did a statistical analysis of the major DNA profile and concluded "[t]he probability of seeing this DNA profile again in the same population group as [Appellant] . . . is one in 1852." Ms. MC reported the best statistic she could obtain for Y STR DNA testing is "[p]robably somewhere in the range of 1 in 2000."

### *e. Appellant's Trial Testimony and Trial Result*

Appellant conceded that he penetrated AB EA's vulva with his finger but he denied being aroused sexually or sexually gratified by it. Appellant denied penetrating her vulva with his tongue, but conceded that he penetrated her vulva with his penis.

Appellant agreed that AB EA came to his room to pop his back. He agreed he was not wearing a shirt when he answered the door, but testified he was wearing "PT shorts," not underwear. Appellant recalled that they engaged in small talk while he was laying on his bed and she was sitting on the foot of the bed. Appellant remembered inviting AB EA to "lay down" and they "started to spoon" with "no space in between [them]." A minute or two later, Appellant

---

repeats on the chromosomes that do not involve the X or Y chromosome. Autosomal STR testing was done on the vaginal swab and hand swabs of AB EA and the penile swab of Appellant.

[15] Also on the hand swabs of AB EA, Ms. MC found a chemical indication of blood on a presumptive test for biological fluids. Ms. MC elected not to do a confirmatory test as it was more important to conserve the swabs for the DNA testing and for subsequent testing, if needed.

[16] Ms. MC explained that Y STR DNA testing involves looking at short tandem repeats on the Y chromosome and is not as discriminating as autosomal STR testing because the Y chromosome is paternally inherited.

recalled moving her hair and kissing her neck and then placing his left hand "through the back side of her pants" in an "attempt to finger her." Appellant testified there was no protest from AB EA.

As the angle was awkward, Appellant testified that AB EA rolled onto her stomach and "[spread] her legs open a little bit . . . to show [him] that she's giving [him] access so [he] can actually finger her." Appellant recalled her moaning a little bit. Appellant described this as "still a very awkward angle" so he asked her to roll over onto her back and take off her pants, which were "some form of athletic shorts." Appellant testified that she took off her shorts and had her underwear on which he moved aside and began to "finger her again" without protest.

Appellant recalled the two kissing before he asked AB EA if she wanted him to wear a condom. He testified that she responded "I don't care." Appellant recalled getting off the bed, retrieving a condom, putting it on with two hands, and that AB EA removed her underwear and placed them on the side of the bed. After he penetrated her with his penis, Appellant testified that she reacted with "soft moans," wrapping around him, and then "squeezing the bed sheets." Appellant testified they switched positions, so he was behind her and they resumed intercourse until the condom dried out. He then got off the bed, retrieved lubrication from his nightstand drawer, and put it on the condom. Appellant recalled AB EA now being on her back and he penetrated her with his penis and when he started to go "faster and harder" her body started to tense up and then she softly said "stop." Appellant "slowed down" because he took "stop" to mean stop going so hard. After a few more minutes, Appellant saw on AB EA's face that something was bothering her and then she told him to stop and pushed him back so he stopped immediately. Appellant asked what was wrong and her response was "[w]e shouldn't be doing this, you have a wife." Appellant went to the bathroom and flushed the condom down the toilet. On return he saw AB EA dressed and appearing "[l]ike she's in regret" and "not like angry upset, just more like, '[w]hy did I do this?'" Appellant asked if she was going to tell A1C PC, and AB EA said "No, I'm not going to tell [A1C PC]."

Appellant testified that he received a no-contact order the next day or the day after. Regarding the audio recording of the call where he said everything that happened should not have happened, Appellant testified he was referring to cheating on his wife.

On cross-examination, Appellant denied penetrating AB EA without a condom. To his knowledge, the condom did not break and he did not feel it break. Regarding the recorded phone call and the reference to going to jail, he testified he was referring to adultery because he had "heard that you can go to jail for

adultery."[17] In response to questioning by the military judge, Appellant stated that he searched on Google for adultery as a crime in the military and learned "it's a possibility" that he could go to jail.

Despite Appellant's testimony, the military judge convicted him of sexually assaulting AB EA as charged.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

#### 1. Additional Background

##### *a. Amn MM*

Appellant raises multiple challenges regarding the sufficiency of the evidence underlying his convictions involving Amn MM. He asserts their prior sexual relationship was "violent in nature." He states that Amn MM admitted it was mutually understood that when she visited him it was for the purpose of having sex.[18] He claims he "mistook her appearance at his dorm room as an indicator for sex and violent sex at that." Appellant argues that once Amn MM told him to get off her, he complied and allowed her to leave his room.

Appellant points to portions of his own testimony to support why he was mistaken that Amn MM consented to the sexual activity and the face slap. Regarding the face slap and how hard he struck Amn MM, he asserts that he responded to her prior "criticisms" that he "hit like a bitch." Appellant argues that Amn MM's clothes were not ripped or damaged, and afterwards she only texted him about being slapped. He argues the Government called no witnesses who overheard the struggle Amn MM described. Finally, he claims that Amn MM had a "clear motive" to lie to preserve both her new relationship and her reputation once her facial injury could not be concealed.

The Government argues that the factfinder received sufficient evidence and could have found the elements of each offense were proven beyond a reasonable

---

[17] Adultery is a violation of Article 134, UCMJ, 10 U.S.C. § 934. The elements include (1) wrongful sexual intercourse; (2) when the military member or the other person was married; and (3) under the circumstances, the conduct is either prejudicial to good order and discipline or of a nature to bring discredit upon the armed forces. *MCM*, pt. IV, ¶ 62.b. A court-martial conviction for adultery carries a maximum confinement term of one year. *MCM*, pt. IV, ¶ 62.e.

[18] Trial defense counsel asked Amn MM, "Now didn't you tell us, in your pretrial interview, when you were going up to his room it was sort of understood that coming over would mean sex, correct?" Amn MM replied, "Sort of; yes, sir."

doubt. The Government disagrees that Appellant had an honest and reasonable mistake of fact that Amn MM consented to either offense because of their prior sexual activities and highlights the differences with their prior activities. The Government argues that Amn MM was a credible witness who never claimed that her clothing was ripped or damaged or that others overheard the encounter with Appellant. The Government counters Amn MM's alleged motive to misrepresent to preserve a relationship by noting the absence of cross-examination on this point. Regarding Amn MM's need to explain her facial bruising, the Government argues Amn MM immediately reported what happened to A1C AP before the bruising was reported to others.

### b. AB EA

Appellant states that even if we believe AB EA's account of what happened, the evidence supports that he reasonably believed she consented to sexual intercourse. Appellant reminds us that AB EA entered his room willingly, did not attempt to leave, never screamed or called for help, never fought him off, and never moved or forcibly protested when he started to remove her clothes. In his view, "[w]ith perhaps one exception, [AB EA] similarly did not significantly struggle" and "admitted to simply lying on his bed" and staying there even when he stopped to retrieve a condom, and later lubricant. Appellant claims that AB EA "merely" scratched his arm and that she testified he had no reaction to it which means it must have been insignificant. Appellant finds "most instructive" that AB EA acknowledged that Appellant was surprised to learn she was not consenting and when he saw she was "genuinely upset" he "backed off." He points to his testimony that AB EA allowed him to kiss her, exhibited signs of pleasure, and only during sex indicated that something bothered her which caused him to stop immediately. Afterwards, Appellant believed AB EA was very conflicted, like she felt as though she had made a mistake.

Separately, Appellant challenges AB EA's credibility on two grounds. First, that AB EA adamantly denied he was a close friend even though she used those exact words to Nurse MJ. Second, Appellant questions why AB EA testified at trial that on the day in question he may have only been dating A1C PC when AB EA actually knew he was married and told this fact to Nurse MJ.

The Government responds that it proved that AB EA did not consent beyond a reasonable doubt and that Appellant did not have a reasonable mistake of fact as consent. The Government concedes that Appellant denied penetrating AB EA with his tongue, but argues the remaining elements of the offenses, except consent, are not in dispute. The Government argues that AB EA was credible and the inconsistencies regarding whether Appellant was a close friend or had already married A1C PC are minor inconsistencies unrelated to

the offenses. According to the Government, AB EA reported a consistent account to her roommate, to Nurse MJ, and in her trial testimony. Further, the Government recites the corroborating forensic evidence and the pretext recorded call where Appellant admitted he was already going to jail for what happened.

**2. Law**

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citation omitted); *see also United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325. "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

For the abusive sexual contact of Amn MM, a violation of Article 120, UCMJ, the Government had to prove beyond a reasonable doubt: (1) Appellant committed sexual contact upon Amn MM by touching her hips through the clothing; (2) Appellant did so by causing bodily harm to her, to wit: touching her hips through the clothing without her consent; and (3) Appellant did so with intent to gratify his sexual desire. *See Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶ 45.b.(8)(b). In this context, the term "sexual contact" means "any touching . . . either directly or through the clothing, [of] any body part of any person, if done with an intent to arouse or gratify the

sexual desire of any person." *See MCM*, pt. IV, ¶ 45.a.(g)(2)(B). "Bodily harm" means "any offensive touching of another, however slight, including any non-consensual sexual act or nonconsensual sexual contact." *See MCM*, pt. IV, ¶ 45.a.(g)(3). "Consent" means a freely given agreement to the conduct at issue by a competent person. *See MCM*, pt. IV, ¶ 45.a.(g)(8)(A). An expression of lack of consent through words or conduct means there is no consent. *Id.*

For the assault consummated by a battery of Amn MM, a violation of Article 128, UCMJ, the Government had to prove two elements beyond a reasonable doubt: (1) Appellant did bodily harm to Amn MM, by striking her in the face with his hand; and (2) the bodily harm was done with unlawful force or violence. *See MCM*, pt. IV, ¶ 54.b.(2). "Bodily harm" means any offensive touching of another, however slight. *See MCM*, pt. IV, ¶ 54.c.(1)(a).

For the offenses involving AB EA, the elements of sexual assault varied among the three charged specifications. For the penetrations involving Appellant's finger and tongue, which were two separate violations of Article 120, UCMJ, the elements included: (1) that at the time and place alleged, Appellant committed a sexual act, to wit: penetrating AB EA's vulva with his finger and tongue; (2) that Appellant did so by causing bodily harm, to wit: penetrating her vulva with his finger and tongue without her consent; and (3) that Appellant intended to gratify his sexual desire. *See MCM*, pt. IV, ¶ 45.b.(4)(b). For the penetration involving Appellant's penis, also a violation of Article 120, UCMJ, the elements included: (1) that at the time and place alleged, Appellant committed a sexual act, to wit: penetrating AB EA's vulva with his penis; and (2) that Appellant did so by causing bodily harm, to wit: penetrating her vulva with his penis without her consent. *See MCM,* pt. IV, ¶ 45.b.(3)(b).

In this context, "sexual act" includes either (1) contact between the penis and vulva where contact involving the penis occurs upon penetration, however slight; or (2) the penetration, however slight, of the vulva of another by any part of the body with an intent to arouse or gratify the sexual desire of any person. *See MCM*, pt. IV, ¶ 45.a.(g)(1). The definitions of "bodily harm" and "consent" are the same as described above with the abusive sexual contact offense involving Amn MM.

### 3. Analysis

#### a. Amn MM

We begin with Appellant's conviction for abusive sexual contact by touching Amn MM's hips through her clothing. A reasonable factfinder could have concluded that Appellant tried to pull Amn MM's leggings down, as she testified, despite his denials in his testimony. During this tug of war with Amn MM's leggings, a reasonable factfinder could have concluded that Appellant touched

Amn MM's hips through her clothing without her consent. On the final element, whether Appellant touched Amn MM in this manner to gratify his sexual desire, a reasonable factfinder could have relied on the strong circumstantial evidence of the words and actions of Appellant to find this element satisfied. A reasonable factfinder could have discounted Appellant's testimony that "sexual gratification was not on my mind" and instead given more weight to his earlier written sworn statements to law enforcement in determining his intent. For example, those statements used wording such as "kissing wasn't working to the point *I needed*" (emphasis added), and that he was caught in the "heat of the moment."

A reasonable factfinder could also have rejected a mistake of fact defense because even if Appellant was mistaken, as he claims, such a mistake was not reasonable under the circumstances. Both Appellant and Amn MM agreed that she was not coming to his room for sex, which significantly reduced the importance of their prior dormitory meetings for consensual sex. The reason that Amn MM was not going to have sex with Appellant was because he had called her an offensive name when she decided to pursue a relationship with someone other than Appellant. While Appellant may have held out hope that his face-to-face apology would be sufficient to erase his callous name calling and permit their sexual relationship to continue, Amn MM's physical movement to leave the room after his "apology" was a blatant signal that he ignored. He recognized this exact point in his second statement to law enforcement when he wrote "Looking back I . . . should [have] just let her leave." But he did not.

The subsequent signs that a mistake would be unreasonable under the circumstances would not be difficult for a factfinder to see. A factfinder could conclude that Amn MM physically resisted Appellant and said words to him such as "no. Stop. Don't do that. Get off." Even Appellant, at varying times, acknowledged that he met physical resistance when he described Amn MM as "jerking" her head when he tried to kiss her and squirming away, though he also used more benign language elsewhere in his testimony. To resolve any lingering dispute, a reasonable factfinder could have looked to Appellant's second statement to law enforcement when he wrote there "were multiple signs I should [have] paid more attention to" and determined his repeated failures to pay attention made a mistake of fact wholly unreasonable under the circumstances.

Turning to the assault consummated by a battery, there was no dispute about how hard Appellant hit Amn MM in the face or the injury he caused. A reasonable factfinder could have found that a strike of such force was in direct response to Amn MM's rebukes of Appellant's sexual contact and her subsequent physical push of Appellant. Amn MM's testimony on this point was consistent with her immediate report to A1C AP that she pushed Appellant off of

her and he hit her in the face. In deciding the weight to give Appellant's testimony to the contrary, a reasonable factfinder would have considered if it was even possible to reconcile the conflicting statements Appellant made, at various times, as to why he struck Amn MM and how she responded. A reasonable factfinder could have determined that some of Appellant's statements were less than truthful and that his credibility was highly suspect. Finally, to the extent that there was evidence regarding Amn MM's motives to misrepresent available to the finder of fact, these could have been reasonably discarded as unimportant in light of Amn MM immediately seeking out A1C AP and disclosing what happened.

Drawing "every reasonable inference from the evidence of record in favor of the prosecution," the evidence was legally sufficient to support Appellant's conviction of abusive sexual contact and assault consummated by a battery of Amn MM beyond a reasonable doubt. *Barner*, 56 M.J. at 134 (citations omitted). Moreover, having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses as the military judge did, we are convinced of Appellant's guilt beyond a reasonable doubt. *See Turner*, 25 M.J. at 325. Appellant's convictions involving Amn MM are both legally and factually sufficient.

### b. AB EA

At trial, Appellant's defense had four major components: (1) AB EA consented to the penetration of her vulva by his finger; (2) the penetration with his finger was not for his sexual gratification, but hers; (3) AB EA consented to the penetration with his penis; and (4) he never penetrated her vulva with his tongue. Additionally, he presented a reasonable mistake of fact as to consent defense to the three offenses. On appeal, Appellant argues that a reasonable factfinder would have found he possessed a reasonable mistake of fact that AB EA consented to the sexual activity and acquitted him of the charged offenses.

In evaluating whether this defense was available to Appellant, a reasonable factfinder would have considered all of the relevant evidence presented. This would have included the matters not in dispute, such as AB EA entering Appellant's room willingly. However, a reasonable factfinder would have also considered that there was no prior sexual relationship between the two of them and the agreed purpose of the visit was for AB EA to pop Appellant's back.

Appellant asserts a litany of things that AB EA did not do, such as leave, scream, call for help, fight him off, move or forcibly protest when her clothes were removed, or resist more vigorously. He also argues she stayed on the bed when he retrieved a condom and lubricant. Certainly, a reasonable factfinder would have considered all of the relevant evidence. But, Appellant ignores other evidence, available to the factfinder, which included AB EA turning her

head when he attempted to kiss her, saying she was not there for this reason, denying they had a connection, pulling her shorts back up after he pulled them down, telling him to stop and that he was hurting her while he fingered her, backing away from him, resisting so Appellant would say to her "quit fighting it," pushing away from the walls, resisting turning over, telling him she did not want to do this, clawing and scratching his arm after he said she was "already doing this," crying, and when he tried to perform oral sex on her crushing his head with her legs. A reasonable factfinder could have found that a mistake of fact, if held, was unreasonable in light of AB EA's testimony.

Appellant finds "most instructive" that AB EA acknowledged that Appellant was surprised to learn she was not consenting and when he saw she was "genuinely upset" then he "backed off. This fact lends some credence that Appellant may have had an honest mistake of fact, but it does not mean such a mistake was reasonable under the circumstances. Consent requires a "freely given agreement." *See MCM*, pt. IV, ¶ 45.a.(g)(8)(A). As the United States Court of Appeals for the Armed Forces (CAAF) has said, the "burden is on the actor to obtain consent, rather than the victim to manifest a lack of consent." *United States v. McDonald*, 78 M.J. 376, 380 (C.A.A.F. 2019). A reasonable factfinder could conclude that Appellant did not obtain consent from AB EA, making his claim that he honestly believed she consented to be unreasonable.

Additionally, AB EA's testimony did not stand alone; there was powerful evidence from other witnesses. Amn KC and Amn AG both testified how upset AB EA was immediately after she arrived back in her room. After wailing so loud that Amn AG could hear her in the shower and being comforted by Amn KC on the bed, eventually AB EA could utter the words "he wouldn't stop." Similarly, AB EA's narrative to Nurse MJ during the SAFE provided support as it included statements that Appellant was told "stop" and "no" multiple times as well as that AB EA tried to leave. The narrative included Appellant's statement to AB EA to "[s]top fighting it" and that AB EA "started scratching and clawing his arm." Nurse MJ observed and photographed similar "fairly new" and "scattered scratches" on Appellant's arm during his SAFE.

While Appellant relies on his testimony to support his claim of mistake of fact, a reasonable factfinder could have discounted Appellant's version that AB EA allowed him to kiss her, exhibited signs of pleasure, that he stopped immediately when something was bothering her, and that she appeared regretful afterwards. Instead, a reasonable factfinder could have believed AB EA's testimony and the evidence which supported her testimony.

Appellant challenges AB EA's credibility, as he did unsuccessfully at trial. A reasonable factfinder could conclude that whether Appellant and AB EA were "close friends" or between a "friend and acquaintance" was unimportant

to whether the offenses occurred or whether Appellant had a reasonable mistake of fact defense. In a similar fashion, whether AB EA recalled accurately to Nurse MJ whether Appellant was married or dating A1C PC had little bearing on the charged offenses or a mistake of fact defense.

Drawing "every reasonable inference from the evidence of record in favor of the prosecution," the evidence was legally sufficient to support each of Appellant's convictions of sexual assault of AB EA beyond a reasonable doubt. *Barner*, 56 M.J. at 134 (citations omitted). Moreover, having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses as the military judge did, we are convinced of Appellant's guilt beyond a reasonable doubt. *See Turner*, 25 M.J. at 325. Appellant's convictions involving AB EA are both legally and factually sufficient.

## B. Military Judge Recusal

### 1. Additional Background

Recusal was raised twice. The first time was in a defense motion filed prior to trial which the military judge denied. The second time was when the military judge *sua sponte* reconsidered his ruling after Appellant requested to withdraw his guilty plea to battery of Amn MM. We begin with the events that led to the Defense's pretrial recusal motion.

Appellant's case was originally set for trial on 4 June 2018. On 30 May 2018, Appellant and his two military defense counsel signed an offer for pretrial agreement (PTA) where *inter alia* Appellant would plead guilty to certain specifications and elect trial before military judge sitting alone in exchange for other offenses being dismissed and a cap on the amount of confinement that could be approved by the convening authority. On 1 June 2018, Appellant and his two military defense counsel signed a stipulation of fact. In reliance on the PTA offer and stipulation, the Government canceled the travel arrangements for certain witnesses needed for a contested trial. The PTA offer and stipulation were short-lived as Appellant withdrew the offer on 3 June 2018, the day before trial.[19] Given this development, also on 3 June 2018, Appellant's senior defense counsel filed a motion requesting a continuance. The Government did not oppose. The military judge who was detailed to the case, Colonel Jefferson B. Brown, granted the continuance until 18 September 2018. The senior defense counsel also moved to withdraw as Appellant expected to hire civilian defense counsel while Appellant's military defense counsel remained on the case. Judge Brown granted the Defense's motion to release the senior defense

---

[19] The PTA and stipulation of fact in the record of trial only bear the signatures of Appellant and his military defense counsel. The Government's decision to stop some witness travel indicates support for the PTA.

counsel. Shortly thereafter, the military judge who presided at trial was detailed and issued all subsequent rulings described in this opinion.

On 14 August 2018, Appellant's new defense team—his detailed military defense counsel and his civilian defense counsel—filed a motion for a continuance until 29 October 2018, due to a scheduling conflict with the Defense's expert psychologist consultant. The assistant trial counsel submitted the Government's response opposing the continuance and cited the earlier continuance that was granted to the Defense. For some reason, the assistant trial counsel attached Appellant's withdrawn PTA offer and stipulation of fact to his motion response when it was sent to the military judge.[20] The assistant trial counsel also wrote in his motion response, with citation to the withdrawn stipulation of fact,

> [Appellant] offered to plead guilty to sexually assaulting [AB] EA and committing aggravated sexual contact and assault consummated by [a] battery upon [Amn] MM. On 1 Jun[e] [2018], [Appellant] and Defense Counsel signed a stipulation of fact in which [Appellant] admitted that he had sex with [AB] EA and that [AB] "EA clearly told [Appellant] to stop. However, [Appellant] admits that he did not stop."

The assistant trial counsel's decision to include such details and attachments prompted the Defense to file the recusal motion. In the motion, trial defense counsel asserted that the military judge now had personal knowledge of disputed evidentiary facts concerning the proceeding which required his recusal under R.C.M. 902(b)(1). Alternatively, trial defense counsel asserted the military judge's impartiality might reasonably be questioned under R.C.M. 902(a). The Government opposed both grounds of the Defense's recusal motion. Regarding R.C.M. 902(b)(1), the Government asserted the military judge had no "personal knowledge" of the facts of the case that would require recusal under this rule. Regarding R.C.M. 902(a), the Government noted the military judge had made no statements regarding whether his impartiality would reasonably be questioned, that the law did not require his recusal, he had discretion to preside over the case, and could "simply choose not to read the PTA offer or the stipulation of fact." As the parties did not request argument at an Article

---

[20] The Defense's recusal motion alleged this was a violation of Mil. R. Evid. 410 which prohibits, with limited exceptions, the admission of evidence regarding any statement made during plea discussions if the discussions did not result in a guilty plea. The Government, at trial, asserted this rule "does not apply" because the continuance motion "does not relate to the admission of evidence at trial." The military judge did not rule on the applicability of Mil. R. Evid. 410.

39(a), UCMJ, 10 U.S.C. § 839(a), session, the military judge issued a ruling declining to recuse himself.[21]

At the initial Article 39(a), UCMJ, session, the military judge inquired whether either side wanted to question or challenge him. Civilian defense counsel questioned the military judge on whether he read the PTA and stipulation that were attached to the Government's motion response. The military judge replied that he had not read the attachments to either the defense motion or the government response. The military judge also was questioned regarding whether he had formed any unfavorable opinions about the guilt or innocence of Appellant. The military judge indicated he had not formed any such opinions. Civilian defense counsel asked whether there was anything affecting his ability to be fair and impartial to Appellant. The military judge replied, "Absolutely nothing."

Shortly thereafter, Appellant requested trial by military judge alone and a written request was marked as an appellate exhibit. The military judge granted Appellant's forum choice and Appellant initially entered a plea of guilty to battery of Amn MM. After a providence inquiry, the military judge accepted Appellant's pleas and announced findings of guilty to this charge and specification. As Appellant pleaded not guilty to the remaining charge and specifications, the Government presented its findings case. As both specifications involving Amn MM were closely intertwined, Amn MM testified, over defense objection, to the circumstances of the battery. Appellant also testified regarding the battery and stated that he took Amn MM's mumbling as "strike me" so he smacked her across the face.

After Appellant's testimony in the Defense's findings case, the military judge stated that he was "going to reopen the providence inquiry" to address whether "it would have been unreasonable" for Appellant to hit Amn MM if, at the time of the slap, he thought she said "strike me." Referencing the earlier providence inquiry, the military judge stated "I don't believe he had mentioned—and perhaps my recollection is wrong—but [according to Appellant's testimony in findings] she literally asked to be hit." After a recess, Appellant requested to withdraw his guilty plea, which the military judge granted after finding good cause existed because a legal defense existed. The military judge explained to Appellant that under Mil. R. Evid. 410 he would "put . . . out of [his] mind" everything that Appellant told him during the providence inquiry.

---

[21] The issue with the Defense's expert consultant was resolved prior to trial so the military judge never ruled on this continuance request.

The military judge then *sua sponte* reconsidered the defense motion for recusal. Citing R.C.M. 902 and caselaw,[22] the military judge found no reason for recusal and stated "I have no concerns about my ability to be impartial and to put that information out of my mind." The military judge asked whether either side wanted to question or challenge him. Neither party did.

On appeal, Appellant argues the military judge abused his discretion when he did not recuse himself (1) prior to the start of trial; and (2) after the withdrawal of the guilty plea. Prior to trial, Appellant asserts that R.C.M 902(b)(1) applies as the military judge had "prior knowledge of now-disputed evidentiary facts" and the circumstances raise "reasonable questions" about whether the military judge could serve as an impartial factfinder. After the withdrawal of the plea, Appellant argues the military judge's options were either to recuse himself or to direct trial by court members. He claims it was "impossible" for the military judge or "any jurist" to serve as a fair, impartial factfinder after hearing two completely contradictory statements under oath from Appellant, one in the providence inquiry and the other during his findings testimony. Finally, Appellant argues the military judge should have followed the Discussion to R.C.M. 910(h) which states "recusal of the military judge or disapproval of the request for trial by military judge alone will ordinarily be necessary when a plea is rejected or withdrawn after findings." The Government responds the military judge did not abuse his discretion either time he declined to recuse himself.

**2. Law**

We review a military judge's decision not to recuse himself for an abuse of discretion. *See United States v. Sullivan*, 74 M.J. 448, 454 (C.A.A.F. 2015). "A military judge abuses his discretion when: (1) the findings of fact upon which he predicates his ruling are not supported by the evidence of record; (2) if incorrect legal principles were used; or (3) if his application of the correct legal principles to the facts is clearly unreasonable." *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citing *United States v. Mackie*, 66 M.J. 198, 199 (C.A.A.F. 2008)). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be 'arbitrary, fanciful, clearly unreasonable,' or 'clearly erroneous.'" *United States v.*

[22] *United States v. Dodge*, 59 M.J. 821 (A.F. Ct. Crim. App. 2004); *United States v. Melton*, 1 M.J. 528, 530 (A.F.C.M.R. 1975). In *Melton*, our court's predecessor noted that the military judge may perceive the providence of plea is questionable because of a lack of understanding of the legal principles and potential defenses available and thus determine the better course of action would be to change the plea to not guilty, not because of any real factual dispute, but because of a misunderstanding of the legal effect of the facts. 1 M.J. at 531. The *Melton* court found this showed a concern for fairness by the military judge, rather than suggesting any partiality or bias. *Id.*

*McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000) (quoting *United States v. Miller*, 46 M.J. 63, 65 (C.A.A.F. 1997); *United States v. Travers*, 25 M.J. 61, 62 (C.M.A. 1987)).

"An accused has a constitutional right to an impartial judge." *United States v. Wright*, 52 M.J. 136, 140 (C.A.A.F. 1999) (citations omitted). R.C.M. 902 governs disqualification of the military judge. R.C.M. 902(b) sets forth five specific circumstances in which a "military judge shall disqualify himself or herself." The first specific circumstance, in R.C.M. 902(b)(1), requires disqualification "[w]here the military judge has a personal bias or prejudice concerning a party or personal knowledge of disputed evidentiary facts concerning the proceeding." R.C.M. 902(b)(1) applies the "same substantive standard" as its civilian counterpart, 28 U.S.C. § 455. *United States v. Quintanilla*, 56 M.J. 37, 45 (C.A.A.F. 2001). The Drafter's Analysis to R.C.M. 902(b) notes that "any interest or bias to be disqualifying must be personal, not judicial, in nature." *MCM*, App. 21, at A21-50.

In addition, R.C.M. 902(a) requires disqualification "in any proceeding in which that military judge's impartiality might reasonably be questioned." Disqualification pursuant to R.C.M. 902(a) is determined by applying an objective standard of "whether a reasonable person knowing all the circumstances would conclude that the military judge's impartiality might reasonably be questioned." *Sullivan*, 74 M.J. at 453 (citing *United States v. Hasan*, 71 M.J. 416, 418 (C.A.A.F. 2012)).

"There is a strong presumption that a judge is impartial, and a party seeking to demonstrate bias must overcome a high hurdle particularly when the alleged bias involves actions taken in conjunction with judicial proceedings." *Quintanilla*, 56 M.J. at 44 (citation omitted). A military judge "should not leave [a] case 'unnecessarily.'" *Sullivan*, 74 M.J. at 454 (quoting R.C.M. 902(d)(1), Discussion). "Of course, '[a] . . . judge has as much obligation not to . . . [disqualify] himself when there is no reason to do so as he does to . . . [disqualify] himself when the converse is true.'" *United States v. Kincheloe*, 14 M.J. 40, 50 n.14 (C.M.A. 1982) (alterations in original) (citations omitted).

"There is no *per se* rule that military judges are disqualified whenever, after accepting guilty pleas, they must later reject those pleas based on unforeseen circumstances." *United States v. Winter*, 35 M.J. 93, 95 (C.M.A. 1992). "Even more so, there is no invariable requirement that judges *sua sponte* recuse themselves in all such cases. *Id.* (citations omitted). "[E]ven though a judge is not *per se* disqualified from presiding over a bench trial after rejecting guilty pleas, the facts of a particular case may still require recusal of the military judge, especially if the judge has formed an intractable opinion as to the guilt of the accused." *Id.* (citing *United States v. Bradley*, 7 M.J. 332 (C.M.A. 1979)). A military judge's statements on the record may "make clear that he had no

28

intractable opinion" regarding guilt or sentence. *United States v. Bray*, 49 M.J. 300, 306–07 (C.A.A.F 1998).

"Where the military judge makes full disclosure on the record and affirmatively disclaims any impact on him, where the defense has full opportunity to *voir dire* the military judge and to present evidence on the question, and where such record demonstrates that [an] appellant obviously was not prejudiced by the military judge's not recusing himself, the concerns of R.C.M. 902(a) are fully met." *United States v. Campos*, 42 M.J. 253, 262 (C.A.A.F. 1995) (citation omitted).

### 3. Analysis

#### a. Recusal Prior to Trial

We find no abuse of discretion when the military judge denied the Defense's recusal motion before court convened. While the military judge's ruling was no more than a summary denial, we find no error. *See United States v. Flesher*, 73 M.J. 303, 312 (C.A.A.F. 2014) (noting if the military judge fails to place his findings and analysis on the record, less deference will be accorded). Our starting point is the strong presumption that a military judge is impartial.

We can quickly dispense with the argument that recusal was required under R.C.M. 902(b)(1) because the Government's motion response discussed the PTA and stipulation briefly and these documents were attached to the motion. Receiving a filing from a party does not give a military judge "personal" knowledge of the facts, disputed or otherwise, in a case. Rather, a military judge who receives a motion response is simply performing judicial duties. Exposure to what the parties are asserting are the facts does not impute "personal" knowledge to the military judge of disputed facts. We agree with the Drafters Analysis to R.C.M. 902(b) that interest or bias is only disqualifying when it is personal, not judicial, in nature. *See MCM*, App. 21, at A21–50. Appellant has not attempted to show the military judge had knowledge of the disputed facts of this case from a source independent of his judicial duties. Accordingly his claim that R.C.M. 902(b)(1) required recusal must fail.

We also find no error under R.C.M. 902(a) because the military judge's impartiality could not reasonably be questioned from his pretrial involvement in this case. While the military judge denied the motion before trial, at the initial Article 39(a), UCMJ, session he was questioned by civilian defense counsel. The military judge confirmed he had not read the attachments to the defense motion or the Government's response and had not formed any unfavorable opinions about Appellant's guilt or innocence. After civilian defense counsel indicated he had no further questions, the military judge, on his own, noted the recusal motion that he had ruled upon earlier. The military judge noted that while he was aware of the PTA and stipulation of fact, he had not read

them and had not discussed them with the prior military judge. In response to a follow-up question by civilian defense counsel the military judge made clear there was "absolutely nothing" that would affect the military judge's ability to be fair and impartial. Shortly thereafter, Appellant selected a forum of military judge alone.

We find the questioning and commentary at the Article 39(a) session qualifies as a full disclosure on the record by the military judge, even if it came after his ruling, and an affirmative disclaimer of any impact from receiving the Government's motion response. *See Campos*, 42 M.J. at 262. The Defense had a full opportunity to voir dire the military judge and asked relevant questions that the military judge directly answered. *See id.* The military judge confirmed both sides had no additional evidence or argument on the recusal motion. Appellant had ample opportunity to present evidence on the question of recusal. Appellant was not obviously prejudiced as the military judge did not read the PTA or stipulation of fact and only read the brief commentary in the Government's actual motion, a matter which would easily been put out of the judge's mind once he learned the case was to be partially contested. Given these circumstances, we conclude the concerns of R.C.M. 902(a) were fully met. *See id.* Objectively, in light of applicable caselaw and the strong presumption that a military judge is impartial, a reasonable person knowing all the circumstances of the military judge's pretrial involvement and his responses on the record, including that no intractable opinions on guilt or sentence were held, would not conclude that the military judge's impartiality might reasonably be questioned. *See Sullivan*, 74 M.J. at 453.

### b. Recusal after Withdrawal of Plea

First, we reject Appellant's claim that it would be impossible for any military judge to be a fair and impartial factfinder after the guilty plea to battery of Amn MM was withdrawn. This argument strikes us as the functional equivalent of a per se rule requiring recusal after a withdrawn plea which would be inconsistent with *Winter*. *See* 35 M.J. at 95.

We recognize that the facts of a particular case may still require recusal of the military judge after a guilty plea is withdrawn, especially if the judge has formed an intractable opinion as to the guilt of the accused. Here, the military judge had no intractable opinion regarding guilt. *See Bray*, 49 M.J. at 306–07. The military judge expressed that he would not consider the providence inquiry, would put it out of his mind, and described "resetting entirely the trial with regard to that charge and its specification." The military judge provided citation to relevant caselaw on recusal and to R.C.M. 902 and briefly stated his findings and analysis. Therefore, we review his ruling on recusal after trial began for an abuse of discretion.

We find no abuse of discretion in the military judge's decision not to recuse himself after granting Appellant's request to withdraw his plea. We note that trial defense counsel did not raise recusal after the military judge told the parties he was reopening the providence inquiry or after Appellant entered a plea of not guilty to battery of Amn MM. Instead, it was the military judge who *sua sponte* reconsidered his earlier ruling. The military judge described the caselaw he relied upon, cited the correct legal standard, and announced that he would put out of his mind the information he had heard during the providence inquiry. The military judge stated on the record that he had "no concerns" about his ability to be impartial. The military judge invited both sides to voir dire him regarding recusal or to challenge him. Both declined. We find a full disclosure, affirmative disclaimer of impact, and full opportunity for questioning existed. *See Campos*, 42 M.J. at 262. We discern no obvious prejudice and find the concerns of R.C.M. 902(a) were fully addressed on the record. A reasonable person with knowledge of the circumstances would have come to the same conclusion the parties did at trial: the withdrawn plea did not raise reasonable grounds to question the military judge's impartiality given the applicable law.

Before us, Appellant argues that he made "completely contradictory statements" that would have led the military judge to conclude he lied under oath at some point. We see this matter differently. This case bears similarities to *Melton*, a case the military judge chose to cite when he issued his ruling. In our view, the military judge's decision to reopen the plea was to ensure Appellant understood the mistake of fact defense. Even during the providence inquiry, Appellant told the military judge that "at the very moment" he hit Amn MM he "did believe" that she had consented. This established the first element of the defense that Appellant had an honest mistake. All that remained was whether Appellant's belief was objectively reasonable. Unsurprisingly, Appellant's testimony in findings revealed that he struggled with judging his own actions by a reasonable person standard. At varying times, Appellant judged his actions personally, but with the benefit of hindsight, rather than by an objective standard at the time of the offense. As we see it, Appellant merely had difficulty understanding one of the legal principles involved in a mistake of fact defense. Like the court in *Melton* we see the military judge's response to reopen the providence inquiry demonstrated concern for fairness of the proceedings rather than some negative reflection on his impartiality.

We acknowledge that the discussion accompanying R.C.M. 910(h) states that in a trial by military judge alone recusal of the military judge or disapproval of the request for trial by military judge will "ordinarily" be necessary when a plea of guilty is withdrawn after findings. However, the Discussions accompanying the Rules for Courts-Martial are supplementary materials and do not have "the force of law." *See MCM*, pt. I, ¶ 4. We find our superior court's decisions in *Sullivan*, *Campos*, and *Winter* provide the appropriate framework

for analyzing recusal and we decline to apply an "ordinary" rule when the inquiry requires a case-by-case determination. We find no abuse of discretion, and indeed no error, when the military judge did not recuse himself after Appellant withdrew his plea of guilty to battery of Amn MM.

## C. Mil. R. Evid. 413

### 1. Additional Background

Before trial, in accordance with Mil. R. Evid. 413(b) and Mil. R. Evid. 404(b), the Government provided notice to the Defense of uncharged sexual assault offenses that Appellant allegedly committed upon a civilian, KM, prior to Appellant joining the Air Force. The notice indicated two of the offenses occurred on 24 June 2015 when Appellant, without consent, (1) attempted to penetrate KM's mouth with his penis, and (2) penetrated KM's vagina with his penis. The notice also indicated that the next day, 25 June 2015, Appellant attempted to penetrate KM's mouth with his penis without her consent and in the course of this attempt hit KM on the head and face with his hand. KM was 16 years old at the time and Appellant was 18 years old.

On 17 May 2018, Appellant's senior defense counsel, who was later released, filed a motion for appropriate relief to exclude this evidence. The Defense contended, *inter alia*, that the evidence was "highly inflammatory" and "unfairly prejudicial" as KM was under the age of 18 and the circumstances involved allegations of physical and sexual violence. The Defense asserted a distracting mini-trial involving numerous witnesses and potentially scientific and/or expert testimony would be needed and that the uncharged misconduct failed a Mil. R. Evid. 403 balancing test. The Defense requested an Article 39(a), UCMJ, session and requested six witnesses: KM and five members of the McKinney Police Department in Texas who investigated the allegations.

On 25 May 2018, the Government opposed the motion for appropriate relief contending *inter alia* that the evidence was admissible under Mil. R. Evid. 413 after the three threshold findings were made under *United States v. Wright*, 53 M.J. 476, 482 (C.A.A.F. 2000), and alternatively admissible under Mil. R. Evid. 404(b) to show Appellant's plan, intent, absence of mistake, and motive with respect to the charged offenses.

A few days after the Government's motion response, the failed PTA negotiations occurred, the case was continued, and the senior military defense counsel who filed the motion for appropriate relief was released. The parties continued their preparations for trial, including which witnesses would be necessary for the Defense. While KM traveled for the trial, no McKinney Police Department officials were on the agreed-upon list of witnesses. No motion to compel witnesses or evidence was filed prior to trial, a matter we discuss in the next assignment of error.

During motion practice on the first day of trial, the military judge inquired whether the current defense team had any evidence to introduce. The Defense declined to offer evidence beyond the attachments to its motion, despite the written motion's assertions that six witnesses would testify. The Government also did not offer further evidence beyond the attachments to their motion. The parties argued their respective positions on admissibility.

The military judge issued a ruling denying the defense motion, finding the evidence admissible under Mil. R. Evid. 413[23] and later read his findings of fact and conclusions of law into the record. Accordingly, KM testified before the military judge as the last government witness.

KM[24] testified that she went to the same high school as Appellant for a time when he was a senior and she was a freshman. They knew each other by association and had mutual friends. They lost contact when KM went to a different school as a sophomore but reconnected on social media in the summer of 2015. On one afternoon, Appellant and KM agreed to meet in the parking lot of a store near KM's house. When Appellant arrived driving a sport utility vehicle (SUV), KM got in and he drove them to a covered parking area in a nearby apartment complex. Appellant began pressing KM's arm in a flirtatious way. KM realized Appellant had gotten the wrong idea about their meeting so she scooted towards the door. Appellant tried touching KM's breast and she pushed his hand away. Appellant responded, "[C]ome on. Why don't you let me touch this? Why don't you want to do this?" KM pulled further away and told Appellant she did not want him to touch her on her breast. After turning her body towards the car door, KM saw Appellant rubbing his "private area" over the top of his pants. When KM looked over, Appellant grabbed her arm and tried to get KM to touch his penis. KM pulled her arm away. This continued for a few minutes until Appellant succeeded in getting KM's hand to touch his "private area" but KM kept her hand clinched in a ball. Once KM yanked her arm away, Appellant pulled down his pants exposing his erect penis which he began touching. He then attempted to get KM to directly touch his penis but KM kept her hand in a fist. Appellant then grabbed the back of KM's neck and pulled her head towards his penis, but she turned her head to the side. The side of KM's face contacted Appellant's penis but not her mouth.

KM could not remember how the two of them came to be in the backseat but she did recall Appellant touching her breasts and inner thighs and her saying that she did not want to have sex with him. Appellant replied "come on,

---

[23] The military judge did not rule on whether the evidence was also admissible under Mil. R. Evid. 404(b).

[24] KM was married at the time of Appellant's court-martial and had a different last name. We use her initials at the time of the uncharged incidents involving Appellant.

just do it" and "[i]t will be worth it" and then took off KM's pants and inserted his penis into her vagina. KM recalled not getting up because she "froze" and then "blanked out" and felt like she "couldn't move." KM testified that Appellant complained that she was not making noise and KM started muffled crying which annoyed Appellant so he stopped. KM recalled Appellant taking off a condom though she did not remember seeing him put a condom on. Afterwards, Appellant drove KM back to the store parking lot.

KM testified "[w]ithin the next few days" Appellant reached out to apologize and asked to meet again. When KM did not initially accept his apology, Appellant threatened to tell others they had sex. Appellant also told KM that she now needed to give him gas money when they met. KM agreed to meet and Appellant picked her up in the parking lot where she worked. KM thought the location would be safe because it was in the open. On arrival, Appellant asked KM to get in the SUV and she agreed because she did not want to make a scene. Appellant drove to a parking lot behind an elementary school that was near KM's house. KM testified that Appellant told her to get into the backseat, which she did, because she was afraid of him. Appellant tried to penetrate KM's mouth with his penis, but only the side of her face touched his penis. Appellant told KM to "get it over with" and to "make up for [her] not being willing to do it" before. KM teared up and did not reply. Appellant then asked her "are you deaf" and hit the side of her face near her ear with his hand. KM recalled looking at him in a "shocked way" and Appellant looked like he was "in shock as well." KM did not think Appellant meant to strike her but just got so frustrated that she would not do what he wanted that he "kind of snapped." KM testified, "[A]s soon as he had done it, [he] let go of me and opened the door and pushed me out of his car." KM unsuccessfully tried to get back in the SUV because her purse and cellphone were still inside but Appellant drove away. KM found her personal items on the road as she walked home.

KM told her best friend what happened with Appellant after the second incident. Her best friend advised KM to tell her parents and KM did. The matter was then reported to the McKinney Police Department. Appellant was never interviewed or arrested by the McKinney Police Department. He was never prosecuted for any offense involving KM.

During the investigation of the offenses involving Amn MM, AFOSI learned through background checks about the incidents with KM and interviewed KM. KM's interview was summarized in an AFOSI report which was before the military judge when he ruled on the admissibility of KM's testimony. Appellant was also questioned about the incidents with KM by AFOSI but this evidence was not provided to the military judge before he ruled.

In his trial testimony, Appellant described the two incidents where KM and he were alone in his SUV. He recalled a consensual sexual encounter with KM

where he wore a condom that ended because it got hot in the SUV. He recalled them meeting the next day, or the day after, for sex. He confirmed that he asked KM for gas money because the SUV was a "gas guzzler." After KM got in the SUV, according to Appellant, KM said she was not going to give him gas money and that she did not want to have sex. Appellant admitted that he got "upset a little bit" and felt he was being "played" by KM so she could get a ride home from work. He testified that he stopped the SUV on the side of the road and asked KM to "please get out" of the SUV. When KM refused, Appellant testified that he unbuckled her seatbelt, asked her to leave again and when she did not leave he threw her personal items out of the drivers' side window. He denied any sexual acts or violence occurred with KM the second time that they were alone. In rebuttal to Appellant's trial testimony, SA PA testified that Appellant told AFOSI that he did not spend one-on-one time with KM and that he never engaged in activity involving a condom or a car with KM. In addition to SA PA's testimony, a short audio excerpt of this AFOSI interview of Appellant was also admitted as rebuttal evidence. The audio excerpt also covered Appellant's denials of spending one-on-one time with KM and being in a car with her and a condom.

### 2. Law

A military judge's decision to admit evidence is reviewed for an abuse of discretion. *United States v. Jerkins*, 77 M.J. 225, 228 (C.A.A.F. 2018) (citing *United States v. Erikson*, 76 M.J. 231, 234 (C.A.A.F. 2017)).

Mil. R. Evid. 413(a) provides that "[i]n a court-martial proceeding for a sexual offense, the military judge may admit evidence that the accused committed any other sexual offense. The evidence may be considered on any matter to which it is relevant." "This includes using evidence of either a prior sexual assault conviction or uncharged sexual assaults to prove that an accused has a propensity to commit sexual assault." *United States v. Hills*, 75 M.J. 350, 354 (C.A.A.F. 2016) (citing *United States v. James*, 63 M.J. 217, 220–22 (C.A.A.F. 2006)).[25] For purposes of Mil. R. Evid. 413, "sexual offense" means an offense punishable under the UCMJ or a crime under federal or state law involving *inter alia* conduct prohibited by Article 120, UCMJ; conduct prohibited by 18 U.S.C. § 109A; contact, without consent, between the accused's genitals and any part of another person's body; or an attempt to engage in the conduct described above. *See* Mil. R. Evid. 413(d)(1), (2), (4), (6).

In *United States v. Wright*, 53 M.J. 476, 482 (C.A.A.F. 2000), the CAAF explained that military judges are required to make three threshold findings

---

[25] However, evidence of sexual offenses charged in the same case may not be used as propensity evidence under Mil. R. Evid. 413. *Hills*, 75 M.J. at 356–57.

before admitting evidence under Mil. R. Evid. 413: (1) the accused is charged with an offense of sexual assault; (2) the evidence proffered is evidence of his commission of another offense of sexual assault; and (3) the evidence is relevant under Mil. R. Evid. 401 and Mil. R. Evid. 402. Additionally, the military judge must apply the balancing test of Mil. R. Evid. 403 to determine whether the probative value of the proffered evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or other countervailing considerations. *Wright*, 53 M.J. at 482. In *Wright*, the CAAF set forth a non-exclusive list of factors to be considered under Mil. R. Evid. 403 in the context of Mil. R. Evid. 413 evidence: the strength of the proof of the prior act of sexual assault; the probative weight of the evidence; the potential for less prejudicial evidence; distraction of the factfinder; the time needed for proof of the prior conduct; the temporal proximity of the prior conduct to the charged offense(s); the frequency of the acts; the presence or absence of intervening circumstances between the prior acts and charged offenses; and the relationship between the parties involved. 53 M.J. at 482 (citations omitted). "The importance of a careful balancing arises from the potential for undue prejudice that is inevitably present when dealing with propensity evidence." *United States v. Solomon*, 72 M.J. 176, 181 (C.A.A.F. 2013) (citation omitted). However, the CAAF has stated that "inherent in [Mil. R. Evid.] 413 is a general presumption in favor of admission." *United States v. Berry*, 61 M.J. 91, 94–95 (C.A.A.F. 2005) (citing *Wright*, 53 M.J. at 482–83).

### 3. Analysis

Appellant contends the military judge abused his discretion by (1) incorrectly concluding that KM's allegations were "in part corroborated" by the McKinney police; (2) misevaluating the strength of proof of the incidents involving KM; (3) concluding the crimes were similar to those charged; and (4) overlooking an intervening circumstance—Appellant's Air Force enlistment. The Government disagrees that the military judge abused his discretion and describes his analysis on the record as "careful and reasoned." Regarding the fourth point—Appellant's enlistment as an intervening circumstance—the Government argues waiver as Appellant did not present this argument to the trial court.

We find the military judge did not abuse his discretion in admitting KM's testimony. The military judge's findings of fact are not clearly erroneous and we adopt them. In his ruling, which was read into the record, the military judge appropriately applied Mil. R. Evid. 413 and *Wright* to find the three initial threshold requirements were met for admissibility of KM's testimony. *See Wright*, 53 M.J. at 482. We briefly describe the three threshold requirements, the first two of which are not in dispute.

During motion practice, trial defense counsel conceded the first two threshold requirements were met and the military judge agreed. First, Appellant was charged with multiple sexual assault offenses in violation of Article 120, UCMJ. Second, the proffered evidence showed commission of other sexual offenses under the definition provided in Mil. R. Evid. 413(d). The other sexual offenses included sexual assault and attempted sexual assault of KM on or about 24 and 25 June 2015.

The third threshold requirement is also not seriously in question. The military judge found the evidence involving KM relevant under Mil. R. Evid. 401 and 402, "if for no other purpose, for propensity purposes." Relevant evidence is evidence that has any tendency to make the existence of any fact of consequence to determining the case more probable or less probable than it would be without the evidence. Mil. R. Evid. 401. Relevance is a low threshold. *United States v. Roberts*, 69 M.J. 23, 27 (C.A.A.F. 2010). Viewed in light of Mil. R. Evid. 413's presumption in favor of admission, we find no abuse of discretion. The military judge could reasonably find the evidence that Appellant sexually assaulted and attempted to sexually assault KM had some logical relevance to the charged sexual offenses involving Amn MM and AB EA. *See Berry*, 61 M.J. at 95 (citation omitted); *United States v. Bailey*, 55 M.J. 38, 40 (C.A.A.F. 2001).

The military judge's ruling balanced the probative value of KM's testimony against any countervailing interests under Mil. R. Evid. 403 and he specifically listed the nine factors enumerated in *Wright*, 53 M.J. at 482, prior to ruling. The military judge did not specifically analyze one factor—the "frequency of the acts"—but this does not cause us concern as we conclude this factor also weighed in favor of admitting KM's testimony rather than supporting its exclusion. The military judge found two separate incidents occurred involving KM. Within each event, Appellant's physical and verbal efforts to engage in sexual acts with KM were persistent. Appellant did not argue this factor weighed in favor of exclusion before the trial court or us.

The military judge's ruling also analyzed two of the *Wright* factors together: "[d]istraction of the factfinder"[26] and "time needed for proof of the prior act." His ruling found only one witness, KM, would testify and that it would be "difficult to imagine less time needed for proof of this." Appellant does not argue the military judge abused his discretion in his conclusion or by combining the analysis of two factors. We find no abuse of discretion as these two factors were related and particularly so in this military judge alone case.

---

[26] The "distraction of the factfinder" factor is concerned with a danger that "admission of this evidence may result in a distracting mini-trial on a collateral issue." *Berry*, 61 M.J. at 97 (citation omitted).

Appellant's first challenge is to the military judge's assessment of the "strength of the proof." Appellant argues the military judge incorrectly concluded "most glaringly" that KM's allegations were in part corroborated by the McKinney police. We are not persuaded that the military judge's conclusion was clearly erroneous or clearly unreasonable.

The summary report from the McKinney Police Department shows that KM told them that on the first incident at the apartment complex Appellant discarded the condom out of the SUV's window. KM said she knew where the condom was. The summary report explains what happened when one officer drove to the scene:

> Upon arrival I saw a passenger car parked as if dropping someone off at the complex. As I walked up attempting to the find the condom a female walked up to me stating she was [KM]. She stated "I wanted to make sure I told you the right place." [KM] then stated they were in either one of these two parking spaces. The parking spaces were numbered 120 and 121. As I looked in the parking lot I saw a light green in color condom in parking space . . . number 120. I took photos of the area and the condom. Officer [W] collected the condom and later placed it in evidence.

During motion argument, trial defense counsel raised the "lack of corroborating evidence" and noted "we don't have the DNA off of the condom that [KM] led them to." Before us, Appellant renews this argument while also mentioning the lack of integrity of the crime scene. To be clear, the military judge only found this was "the condom allegedly used" by Appellant during the first sexual encounter with KM. He made no conclusive findings of fact that it was the actual condom used.[27]

The word "corroborate" as used by trial defense counsel and the military judge was not defined. However, in the context of confessions and admissions, "corroborate" means independent evidence that "raises an inference of truth" and "would tend to establish the trustworthiness" of a statement. *See* Mil. R. Evid. 304(c)(1), (4). The military judge described the corroboration as "limited" and "as expected . . . with only two possible witnesses." The limited corroboration was one of three considerations the military judge found "strengthen[ed] the proof of the prior act." The other two considerations had no caveats: that KM reported shortly after the assault and she had no obvious motive to fabricate. We acknowledge there are certainly other possible explanations for the

---

[27] Appellant testified during trial that he discarded the condom in "a little cup" in the back of the SUV. During her testimony, KM was not asked what happened to the condom.

condom that was taken into evidence by the McKinney police. But the military judge's conclusion was only that there was limited corroboration, and this was not clearly erroneous or clearly unreasonable given the evidence that was before the military judge when he ruled.

Appellant further challenges the strength of the proof citing (1) the absence of social media messages between KM and Appellant after KM gave the McKinney police her passwords; (2) the lack of witness interviews who saw Appellant and KM together; (3) the lack of injuries to KM or damage to her clothing; (4) the lack of results of a SAFE that KM underwent; and (5) a lack of evidence from the SUV. We see little conflict between the absence of this evidence and the military judge's conclusion that corroboration was "limited" and find no abuse of discretion.

Appellant next argues, as he did at trial, that he was not interviewed, arrested, or prosecuted. The military judge agreed and entered findings of fact to this effect that we have adopted. In analyzing this fact, the military judge described the absence of an interview as "curious in isolation" but concluded it did not necessarily diminish the strength of proof of KM's allegation. We agree based on the limited evidence that was before the military judge during motion practice. The strength of proof factor ranges from a high of conviction to a low of gossip. *See Wright*, 53 M.J. at 482. KM's report fell between these two extremes. The military judge had very little before him on why the McKinney police took the actions they did. There are no obvious cues from the police report that KM's allegations were determined to be false, unfounded, or recanted. To be clear, trial defense counsel argued vehemently that "if you had a 16-year-old girl who would have been raped and you had evidence to corroborate that, something somehow would have been done. And at this point, they didn't even call him." In our view, the military judge had to make an independent determination on strength of proof based on the evidence before him. He did and his conclusions are not clearly erroneous or unreasonable. Other military judges may have been swayed that the absence of a civilian law enforcement interview of Appellant was a direct reflection on the merit of KM's allegations. But an abuse of discretion requires more than a mere difference of opinion. *McElhaney*, 54 M.J. at 130.

Appellant's remaining challenge to the strength of proof is that KM's statements "contain numerous inconsistencies and counterintuitive decisions." At motion practice, Appellant argued inconsistencies including whether the SUV's doors were locked or whether Appellant demanded KM must get in the back seat. The military judge found KM's statements to the McKinney police and to AFOSI "are consistent on many details" but that inconsistencies "do exist." The Defense argued, in their written motion, that KM made a counterintuitive decision by getting in Appellant's SUV the second time. While the

military judge did not address this specific argument in his ruling he concluded "[o]n balance, the strength of proof is not so low as to create a substantial risk of unfair prejudice" and that he was "not convinced the allegation is so weak it cannot be fairly considered by a fact-finder." The military judge noted that inconsistencies existed and balanced the strengths and weaknesses of the proof before ruling. We see no abuse of discretion.

Appellant's next challenge is that the charged crimes were not similar to the offenses involving KM. The military judge concluded the offenses were similar because (1) all involved acquaintance versus stranger assaults; (2) all involved force; (3) all involved victims of a similar age to Appellant.[28] Appellant directly challenges the last of the military judge's conclusions that all victims were of a similar age to Appellant. He notes the number of class grades that separated Appellant and KM when they met and contrasts this with AB EA, Amn MM, and Appellant who were all technical school classmates. We are not persuaded by Appellant's direct challenge. The military judge found as fact that KM was 16 years old at the time of the offense and Appellant was 18 years old. The military judge's conclusion that the victims were a similar age to Appellant was not clearly erroneous or unreasonable.[29]

Appellant raises additional grounds for why the offenses were not similar including (1) his relationship with KM was different than Amn MM and AB EA; (2) the incident with KM occurred in a vehicle parked in a public area while the others were in a dormitory room; (3) that KM was a minor and Amn MM and AB EA were adults; (4) only KM's allegations occurred more than once; and (5) only KM alleged a threat. Some of Appellant's listing of differences are obviously true. KM was (1) the only minor; (2) the only one who alleged offenses on two different days; and (3) the only one who was in a parked vehicle with

---

[28] The transcript reads "[a]s opposed to assaults committed by use of drugs or alcohol or incapacitated victims, all of the offenses involved victims that are of similar age to the accused." It is possible the military judge intended to conclude that alcohol and drugs were not used to facilitate any of the assaults against KM, Amn MM, or AB EA, which made the crimes similar. The Government advances such an argument in the answer before us. Such a conclusion would be accurate from our review of the record; however, we do not rely on that similarity as the military judge did not clearly draw that conclusion.

[29] The military judge did not make findings of fact regarding Amn MM's or AB EA's ages. AB EA's date of birth is listed on a prosecution exhibit and we can see she is a similar age to KM. Both KM and AB EA are less than three years younger than Appellant which is sufficient to be a similar age to him. Amn MM's date of birth is redacted in the record of trial but photographs of her were admitted as prosecution exhibits. Appellant does not assert that Amn MM was not a similar age to Appellant and after reviewing the photographs we see no reason to question the military judge's conclusion that Amn MM was also a similar age to Appellant.

Appellant. However, we need not explore all the differences raised on appeal any more than we need to explore the additional similarities argued by the Government during motion practice or in their answer. Instead, we determine whether it was clearly erroneous for the military judge to find the offenses similar on the grounds he stated despite the differences. We find the military judge's conclusion reasonable and that no abuse of discretion exists. Of particular importance to our review is the second similarity mentioned by the military judge and unchallenged before us, that force was involved in each allegation. We find the manner in which force was reported by each victim to be significantly more important to the determination that the offenses were similar than any of the differences cited by Appellant.

Appellant's last claim is that the military judge "clearly overlooked" that Appellant enlisted in the Air Force when he assessed whether there were significant intervening circumstances. The Government argues waiver. The CAAF has made clear that the Courts of Criminal Appeals have discretion, in the exercise of their authority under Article 66, UCMJ, 10 U.S.C. § 866, to determine whether to apply waiver or forfeiture in a particular case, or to pierce waiver or forfeiture in order to correct a legal error. *See, e.g.*, *United States v. Hardy*, 77 M.J. 438, 442–43 (C.A.A.F. 2018) (quoting *United States v. Quiroz*, 55 M.J. 334, 338 (C.A.A.F. 2001)); *United States v. Chin*, 75 M.J. 220, 223 (C.A.A.F. 2016). In this case, we use our discretion and do not apply waiver because we determine there is no legal error to correct. We note that it was the Government's written motion response that first mentioned that Appellant's decision to join the Air Force was a "possible intervening circumstance." The military judge's conclusion was simply that he was "unaware or saw no evidence of any *significant* intervening factors that changed the analysis." (Emphasis added). This conclusion was not an error, clear or otherwise, and certainly was not an abuse of discretion. Appellant did not testify on the motion. There was no evidence before the military judge about how Appellant's completion of basic military training and a portion of technical training significantly changed Appellant, his decision making, or his understanding of the law regarding sexual assault or consent from when he was an adult civilian interacting with KM. Thus, we determine there is no legal error for us to correct regarding this conclusion in the military judge's ruling.

In conclusion, we find the military judge properly admitted KM's testimony, after noting the presumption in favor of admission, and reciting all of the *Wright* factors and analyzing almost all of them. He did not "wholly fail to grapple" with the lack of a full civilian investigation or prosecution. *Cf. Solomon*, 72 M.J. at 181. He considered the inconsistencies and challenges raised to KM's expected testimony and weighed them in determining the probative value and the danger of unfair prejudice. He considered whether there was less

prejudicial evidence and noted that KM would testify live and could be confronted with inconsistencies or evidence that was lacking in the McKinney police summary. He found the temporal proximity to be "relatively close" as KM's accusations were about two years before the charged offenses. Considering what the military judge had before him during motion practice, his ruling and his balancing test under the *Wright* factors was not an abuse of discretion.

As it turned out, presentation of the Mil. R. Evid. 413 evidence was not unduly long or distracting. In this military judge alone trial, KM testified once in an open session of the court for 53 pages of the transcript. While the parties asked questions, the military judge had none. In contrast, Amn MM testified slightly longer, totaling 60 pages, and in both open and closed sessions during the findings portion of the trial. Part of Amn MM's testimony was as a rebuttal witness for the prosecution. Amn MM's roommate also testified as witness. AB EA testified for 90 pages in open session during findings. Two witnesses who saw AB EA immediately after she left Appellant's room also testified. In the Defense's case, some photos of Appellant's SUV were admitted during Appellant's testimony. Overall, Appellant testified about the accusations of KM, in open session, in about 25 pages of transcript on direct examination and there was less than 10 pages of cross-examination regarding KM. The military judge asked no questions of Appellant regarding KM. While the accusations involving KM likely occupied more trial time than initially anticipated, a "distracting mini-trial on a collateral matter of low probative value" did not occur which provides some support that the military judge did not clearly err in admitting KM's testimony. *Cf. Solomon*, 72 M.J. at 182.

## D. Compel Discovery/Production of Evidence and Witnesses

### 1. Additional Background

Immediately after the military judge issued his ruling that KM would be permitted to testify as a Mil. R. Evid. 413 witness, he asked the parties whether they had any questions about his ruling or its effect on the case. Civilian defense counsel responded "[i]n light of the court's ruling, we . . . make an oral motion for continuance or at least if we could have a couple of days to try to gather some more evidence in the case." Civilian defense counsel indicated, *inter alia,*

> We don't know about the police case file, what videotapes may exist, what video interviews may exist, whether or not she saw a SANE, forensic nurse examiner, and what statement she might have made to that individual. We don't have that report either. We don't have DNA evidence, and the officers involved in the case at McKinney will not speak to us without subpoenas.

After more discussion, the oral motion for continuance expanded into an oral motion to compel discovery under R.C.M. 701 and production under R.C.M. 703, including telephonic witness testimony. The Defense asserted it could not effectively represent Appellant and would be "simply unprepared" to address anything KM testified to because "we have no check and we have no additional information as to what exists out there regarding this allegation. We would essentially be flying blind with regard to anything she says." The military judge addressed the timeliness of the motion, which we describe in detail below, before he recessed the court and ordered the Defense to produce a written motion before court reconvened in six hours. The Defense's written motion to compel and for a continuance was filed. It included, as attachments, the discovery requests that had been filed. The Defense called no witnesses to support the motion. The Government provided several documents to show what discovery it had provided to the Defense and both sides presented argument. The military judge denied the motion and later in the trial, after KM testified on findings, provided his essential findings of fact and conclusions of law. Neither side requested the military judge reconsider his ruling after KM testified.

Before us, Appellant raises various challenges to the military judge's ruling. In his assignments of error brief, Appellant initially claimed the military judge did not provide any rationale for his ruling and argued that we should accordingly afford his ruling less deference. While Appellant is correct that the military judge did not announce his findings of fact and conclusions of law at the same point that he ruled, we agree with the Government that the military judge made essential findings of fact and conclusions of law and the appropriate standard of review is an abuse of discretion.

**2. Law**

In reviewing discovery matters, we conduct a two-step analysis: "first, we determine whether the information or evidence at issue was subject to disclosure or discovery; second, if there was nondisclosure of such information, we test the effect of that nondisclosure on [Appellant's] trial." *United States v. Coleman*, 72 M.J. 184, 187 (C.A.A.F. 2013) (quoting *United States v. Roberts*, 59 M.J. 323, 325 (C.A.A.F. 2004)). We review a military judge's decision on a request for discovery for an abuse of discretion. *Roberts*, 59 M.J. at 326 (citation omitted).

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The United States Supreme Court has extended *Brady*, clarifying "that the duty to disclose such evidence is applicable even though there has been no request by the accused" and includes

"impeachment evidence as well as exculpatory evidence." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citation omitted); *see United States v. Claxton*, 76 M.J. 356, 359 (C.A.A.F. 2017) (quoting *Strickler*, 527 U.S. at 280). "A military accused also has the right to obtain favorable evidence under Article 46, UCMJ[, 10 U.S.C. § 846] . . . as implemented by R.C.M. 701–703." *Coleman*, 72 M.J. at 186–87 (footnote omitted). Accordingly, Article 46, UCMJ, and these implementing rules provide a military accused statutory discovery rights that are greater than those afforded by the Constitution. *See id.* at 187 (citations omitted); *Roberts*, 59 M.J. at 327. In particular, R.C.M. 701(a)(2)(A) requires the Government, upon defense request, to permit the inspection of, *inter alia*, any documents "within the possession, custody, or control of military authorities, and which are material to the preparation of the defense . . . ."

"Trial counsel must exercise due diligence in discovering [favorable evidence] not only in his possession but also in the possession . . . of other 'military authorities' and make them available for inspection." *United States v. Jackson*, 59 M.J. 330, 334 (C.A.A.F. 2004) (alterations in original) (quoting *United States v. Simmons*, 38 M.J. 376, 381 (C.M.A. 1993)). "[T]he parameters of the review that must be undertaken outside the prosecutor's own files will depend in any particular case on the relationship of the other governmental entity to the prosecution and the nature of the defense discovery request." *United States v. Williams*, 50 M.J. 436, 441 (C.A.A.F. 1999). The scope of this due-diligence requirement generally is limited to (1) the files of law enforcement authorities that have participated in the investigation of the subject matter of the charged offenses; (2) investigative files in a related case maintained by an entity closely aligned with the prosecution; and (3) other files, as designated in a defense discovery request, that involved a specific type of information within a specified entity. *Id.* (internal quotation marks and citations omitted).

The CAAF has generally agreed with "the proposition that an object held by a state law enforcement agency is ordinarily not in the possession, custody, or control of military authorities." *United States v. Stellato*, 74 M.J. 473, 484 (C.A.A.F. 2015) (citation omitted). "However, a trial counsel cannot avoid R.C.M. 701(a)(2) through the simple expedient of leaving relevant evidence to repose in the hands of another agency while utilizing his access to it in preparing his case for trial." *Id.* (internal quotation marks and citations omitted). The CAAF in *Stellato* identified a number of scenarios from Article III[30] courts where evidence not in the physical possession of the prosecution team is still within the possession, custody, or control of military authorities. These include

---

[30] U.S. CONST. art. III.

when: (1) the prosecution has both knowledge and access to the object; (2) the prosecution has the legal right to obtain the evidence;[31] (3) the evidence resides in another agency but was part of a joint investigation; and (4) the prosecution inherits a case from a local sheriff's office and the object remains in the possession of the local law enforcement. *Id.* (footnotes omitted). Additionally, pursuant to the provisions of R.C.M. 701(a)(6), "a trial counsel cannot avoid discovery obligations by remaining willfully ignorant of evidence that reasonably tends to be exculpatory, even if that evidence is in the hands of a Government witness." *Id.* at 487.

Where the defense specifically requests discoverable information that is erroneously withheld, the error is tested for harmlessness beyond a reasonable doubt. *Coleman*, 72 M.J. at 187 (citations omitted). "Failing to disclose requested material favorable to the defense is not harmless beyond a reasonable doubt if the undisclosed evidence might have affected the outcome of the trial." *Id.* (citation omitted). "Inadvertent nondisclosure has the same impact on the fairness of the proceedings as deliberate concealment." *Strickler*, 527 U.S. at 288. However, "[m]ere speculation that some exculpatory material may have been withheld is unlikely to establish good cause for a discovery request on collateral review," *id.* at 286, "[n]or . . . should such suspicion suffice to impose a duty on [defense] counsel to advance a claim for which they have no evidentiary support." *Id.*

In addition to the discovery rights described above, R.C.M. 703 provides "[e]ach party is entitled to the production of evidence which is relevant and necessary." R.C.M. 703(f)(1); *United States v. Rodriguez*, 60 M.J. 239, 246 (C.A.A.F. 2004). Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "is of consequence in determining the action." Mil. R. Evid. 401. "Relevant evidence is 'necessary when it is not cumulative and when it would contribute to a party's presentation of the case in some positive way on a matter in issue.'" *Rodriguez*, 60 M.J. at 246 (quoting R.C.M. 703(f)(1), Discussion). The moving party is required, as a threshold matter, "to show the requested material existed." *Id.*

In addition to production of evidence, "counsel for the accused . . . shall have an equal opportunity to obtain witnesses . . . in accordance with such regulations as the President may prescribe." Article 46, UCMJ, 10 U.S.C. § 846. "The defense shall submit to the trial counsel a written list of witnesses whose

---

[31] *See United States v. Stein*, 488 F. Supp. 2d. 350, 362–63 (S.D.N.Y. 2007) (finding a deferred plea agreement with a corporation and the Government's admission that it had the unqualified right to demand production of evidence from the corporation gave the Government the legal right to obtain documents subject to one "limited privilege carve-out" in the deferred plea agreement).

production by the Government the defense requests." R.C.M. 703(c)(1). "A list of witnesses whose testimony the defense considers relevant and necessary on the merits or on an interlocutory question shall include the name, telephone number, if known, and address or location . . . and a synopsis of the expected testimony sufficient to show its relevance and necessity." R.C.M. 703(c)(2)(B). "The military judge may set a specific date by which such lists must be submitted." R.C.M. 703(c)(2)(C). "Failure to submit the name of a witness in a timely manner shall permit denial of a motion for production of the witness, but relief from such denial may be granted for good cause shown." *Id.*

"A military judge's ruling on a request for a witness is reviewed for an abuse of discretion." *McElhaney*, 54 M.J. at 126 (citation omitted). "We will not set aside a judicial denial of a witness request unless we have a definite and firm conviction that the trial court committed a clear error of judgment in the conclusion it reached upon a weighing of relevant factors." *Id.* (internal quotation marks and citation omitted).

> Factors to be weighed to determine whether personal production of a witness is necessary include: the issues involved in the case and the importance of the requested witness to those issues; whether the witness is desired on the merits . . . ; whether the witness's testimony would be merely cumulative; and the availability of alternatives to the personal appearance of the witness. Timeliness of the request may also be a consideration when determining whether production of a witness is necessary.

*Id.* at 127 (citations omitted).

### 3. Analysis

The timeliness of trial defense counsel's motion was addressed by the trial court. The military judge considered the filing untimely and seriously considered denying the motion on this ground. Instead, the military judge considered the merits of the motion at the request of the trial counsel. We agree the motion was untimely filed. Two scheduling order deadlines passed without a defense motion to compel any discovery or to produce any evidence or witness. While trial defense counsel made a feeble attempt to argue good cause existed for the untimely filing, the military judge, under his R.C.M. 701(g)(1) authority, had long before specified the timing of discovery and had imposed terms and conditions on when motions to compel were due. The late filing did not give the Government an opportunity to prepare a written response, though evidence and argument were presented. Regarding the merits, we adopt the military judge's essential findings as they are not clearly erroneous. We find no abuse of discretion as (1) the Defense did not show some of the evidence existed under

*Strickler*, 527 U.S. at 286; (2) the evidence that did exist, at least at one time,[32] was not in the possession, custody, or control of military authorities; (3) the Defense failed to show, at trial, how the evidence tended to be exculpatory; and (4) the Defense failed to comply with the procedures required for production and did not demonstrate the necessity of the evidence and witnesses it requested be produced.

### a. Did the Requested Evidence Exist?

The military judge's ruling addressed five pieces of evidence: (1) a SAFE report on KM; (2) written or video recordings of KM's interviews; (3) photographs related to KM's investigation; (4) physical evidence gathered in KM's investigation; and (5) DNA results from the processing of the evidence collected during KM's SAFE. We begin by noting the Defense failed to carry its initial burden that some of the evidence ever existed such that it could be discovered or produced. Specifically, for item (2) above we see no indication in the record of trial that any of KM's interviews were recorded or transcribed. The Defense did not call KM or her parents to testify on the motion that the interviews were recorded or transcribed. The Defense offered no evidence regarding the practices and procedures of the McKinney Police Department on recording or transcribing victim interviews of minors. Similarly, we also see no indication that KM made a written statement to the McKinney police[33] or that additional written notes were taken beyond the summary provided to the Defense. The Defense failed, as a threshold matter, to show that written or video recordings of KM's interviews existed. *See Rodriguez*, 60 M.J. at 246. Therefore, we find no abuse of discretion when the military judge denied this portion of the motion.

The Defense had good reason to believe the remaining items existed, at least at one time. For KM's SAFE report, the police summary showed $528.00 was paid to Texas Health South for a SAFE and KM told the AFOSI agents she underwent the examination. It was a reasonable inference that a SAFE report would have been written and that it would have contained KM's narrative of what occurred as such statements generally guide a SANE during an examination. Similarly, for photographs, the police summary shows that photos were taken of a condom before it was taken into evidence and those photos were saved on a CD. Additionally, during her trial testimony KM indicated that photos were taken of her during her SAFE. As far as physical evidence, the AFOSI summary indicated that KM said her clothes were taken during the

---

[32] Appellant does not assert that the Government failed to meet its affirmative obligation to preserve evidence. *See Stellato*, 74 M.J. at 483.

[33] According to AFOSI's summary of KM's interview, she declined to make a written statement to AFOSI. An AFOSI agent took notes of KM's interview, which were provided to the Defense.

SAFE, and the condom seized from the parking lot was listed as evidence. We evaluate the military judge's ruling on this evidence below.

The questions of whether DNA results existed and tended to be exculpatory are more complex. The AFOSI summary of KM's interview included "[Appellant's] DNA was found on her clothes and on the swabs inside the kit." There are legitimate reasons to question the accuracy of this statement. First, the McKinney police summary does not say that a DNA sample from Appellant was ever obtained by any method. Second, the police summary says nothing about forensic testing of any portion of KM's SAFE kit and does not even list the contents of the kit. Third, the police summary says nothing about the condom being submitted for DNA or any other forensic testing. Fourth, the military judge found as fact that Appellant "was never interviewed, charged, or prosecuted" and this finding is not clearly erroneous. As there are good reasons to question whether DNA testing was even conducted, we look elsewhere in the record of trial for support for or against the existence of DNA results.

A review of Appellant's trial testimony raises further questions about whether exculpatory DNA results existed. During his testimony, Appellant denied knowing that KM had "made, or tried to make, a criminal complaint" against him. Appellant further testified that he first learned of KM's criminal complaint when he was interviewed by AFOSI. He testified "I was never informed" that he had "no idea" and the matter "was brand-new" and "shocking" to him.[34] If Appellant's testimony is taken at face value, it seems unlikely that a DNA sample was knowingly obtained from him during a subject SAFE as it would be obvious that the McKinney Police Department was investigating KM's complaints. On the other hand, Appellant was never asked whether he provided a DNA sample.

During KM's trial testimony, the military judge permitted KM to answer a question about DNA testing before he ruled on a trial counsel objection to its admissibility. KM testified "I cannot 100% say what they found" and "I never spoke directly with the hospital or any of the investigators about what they

---

[34] On cross-examination, Appellant admitted that he received a phone call from someone who identified themselves as a part of the McKinney Police Department who said if Appellant went and saw KM again he would be arrested. Appellant testified the individual did not give a name or badge number and did not ask him to come to the police station. At trial, Appellant expressed doubt that the caller was part of the McKinney Police Department. Regardless, this phone call sheds no light on whether a DNA sample was obtained for comparison testing.

found through my rape kit. I only heard through other—like through my parents what they found."[35] As KM's parents never testified at trial, we have no confirmation or denial from them as to their knowledge of DNA testing or results.

Before us, Appellant asserts that KM lied to AFOSI about the DNA results and "all parties knew this must be false because the McKinney Police Department never interviewed [Appellant] or obtained his DNA" so "any associated DNA would have shown that [Appellant] was not a match." We find Appellant's argument flawed. Either DNA results exist or they do not, and it is Appellant's burden to show they exist. We cannot reconcile the assertion that the McKinney police did not obtain Appellant's DNA yet somehow an unnamed forensic laboratory was able to produce exculpatory results showing Appellant was not a match. Elsewhere in this record of trial is the testimony of a forensic biologist and it is clear to us that a DNA sample from Appellant would be necessary for DNA comparison testing. We note that Appellant has not requested we order a *Dubay*[36] hearing to determine additional facts and we find the development of additional facts unnecessary to resolve this assignment of error considering Appellant's initial burden on the motion.

Based on the record of trial before us, there is insufficient evidence that if DNA testing results existed that they also tended to be exculpatory. KM did not say the DNA results excluded Appellant. No one has asserted that except Appellant in his brief. The Defense had ample opportunity at the trial court and on appeal to investigate whether DNA testing was conducted. It is possible that KM was merely mistaken when she told AFOSI about the DNA results; after all, she apparently only received information about DNA results through her parents. The Defense did not attempt to call KM or her parents to testify to support its motion. KM's mother's name is specifically listed on the McKinney police summary and both parents' names are in the AFOSI agent's notes. There is no evidence that KM's parents were unwilling to share with the Defense what they recalled of KM's investigation. The Defense did not show, at trial or thereafter, that exculpatory DNA testing results involving KM and Appellant exist. We find no abuse of discretion when the military judge denied requests to compel or produce DNA results.

---

[35] After KM provided this answer the military judge asked civilian defense counsel, "[A]ny theory on why I can consider that?" Civilian defense counsel replied, "No sir. We'll move on."

[36] *United States v. DuBay*, 37 C.M.R. 411 (C.M.A. 1967).

### *b. Possession, Custody, or Control of Military Authorities*

The remaining evidence, which it is reasonable to conclude actually existed, at least at one time, includes the (1) SAFE report on KM; (2) photographs related to KM's investigation; and (3) physical evidence gathered in KM's investigation, including the condom seized at the parking lot. We find no abuse of discretion when the military judge concluded this evidence was not in the possession, custody, or control of military authorities.

There is no question that the AFOSI and Prosecution did not participate in the McKinney police investigation that occurred long before Appellant enlisted in the Air Force. Additionally, the McKinney police were not closely aligned with the Prosecution. The military judge made similar conclusions that initially AFOSI "was denied access to any evidence regarding the investigations as a result of Texas state law provisions" and "[e]ventually, [AFOSI] was able to obtain" the summary of the investigation.

Appellant argues the AFOSI's initial request for information about the McKinney police investigation was defective because it did not identify that the information was requested for a criminal justice purpose. We disagree. A concern about AFOSI's request was noted in a written legal opinion from the Texas Attorney General's Office back to counsel for the City of McKinney, although it only related to a three-page document, labeled "Exhibit B," which is in the record of trial and was released to the Defense. Additionally, the opinion of the Texas Attorney General's Office says

> if the city determines the requestor intends to use the [criminal history record information] for a criminal justice purpose and for purposes consistent with the [Texas] Family Code, then the city must release the submitted information that shows the type of allegation made and whether there was an arrest, information, indictment, detention, conviction, or other formal charges and their disposition.

"Exhibit B" only confirms that a condom and CD of photographs were taken into evidence, matters already known from the police summary. All "Exhibit B" adds was that the McKinney police knew who Appellant was, his identifying information, and some identifying information about KM. We find little support for Appellant's claims that a defective AFOSI request "may have proved fatal" to the Government's request for information.

Appellant also claims that there was close alignment because the McKinney police "provided the Government with exclusive access to its officers." We disagree with Appellant's characterization of the access the Government had to the McKinney police. The military judge during the motion argument asked the senior trial counsel what efforts were taken to find out why Appellant was

not prosecuted for offenses involving KM. The senior trial counsel replied, "We did call some of the officers who worked on the case who all told us that they didn't remember the case." As stated above, the Defense had also made contact with at least one of the McKinney police officers but was told "they will not discuss any aspect of the case without a subpoena from the [G]overnment." We do not see a meaningful difference in access when it appears all the Government learned from their contact was the officers had no memory of Appellant's case. There is no claim by Appellant that the Prosecution learned (1) why Appellant was not interviewed, charged, or prosecuted; (2) whether KM made inconsistent statements to the officers; (3) whether they had a copy of KM's SAFE report or kit; or (4) whether they had sent evidence collected to a forensic laboratory for DNA or other testing. In our view, the parties had equal, albeit limited, access to the McKinney police investigation and those who conducted it.

We recognize that "an object held by a state law enforcement agency is ordinarily not in the possession, custody, or control of military authorities" but "a trial counsel cannot avoid R.C.M. 701(a)(2) through the simple expedient of leaving relevant evidence to repose in the hands of another agency while utilizing his access to it in preparing for trial." *Stellato*, 74 M.J. at 484 (internal quotation marks and citations omitted). We see nothing in the record of trial to show that the trial counsel had access to KM's SAFE report, the condom, the CD of photographs, or any purported forensic testing results. Without having access to these materials, the trial counsel could not use them to prepare for trial. The record of trial before us shows the trial counsel had the same access as the defense counsel to these objects—none. Three of the four factors in *Stellato* require no further analysis as we see no access to the objects at any point, no joint investigation, and the prior criminal case from the McKinney police was not inherited by the Prosecution. This leaves only the second factor: "whether the prosecution has the legal right to obtain the evidence." *Id.*

At first blush, the second factor's language seems to indicate that the Government had a "legal right to the evidence" because it could subpoena a witness or witnesses to show up at trial and bring the condom, the CD of photographs, the SAFE report and related evidence, or any forensic testing results and therefore this evidence was within the "control" of the Government. However, such an interpretation is overly broad and would lead to all evidence subject to compulsory process to be within the Government's "control" regardless of where it was held and by whom. A legal "process" to obtain evidence, like a subpoena, is not the same thing as a legal "right" to such evidence. The district court case cited by the CAAF regarding the "legal right to the evidence" had a deferred prosecution agreement (DPA) which gave the United States the "legal right to obtain evidence." *See Stein*, 488 F. Supp. 2d at 363 ("the DPA gives the government the legal right to obtain these documents subject to the limited

carve-out"); *Stellato*, 74 M.J. at 492 (Stucky, C.J., concurring) (addressing that *Stein* concerned the legal right of the Government to obtain materials from an accused based on a DPA). In our view, the district court in *Stein* was not just referencing the availability of subpoena power when it described the legal right to obtain evidence. In Appellant's case, there was no deferred prosecution agreement and the trial counsel had no specified legal right to obtain the evidence from the McKinney police as they were wholly uninvolved in the investigation. The military had no jurisdiction to prosecute the offenses involving KM and it remained a local law enforcement matter even if evidence related to it was later found to be admissible as propensity evidence under Mil. R. Evid. 413. The military judge cited *Stellato* in his ruling and distinguished it. We find no abuse of discretion as the military judge's conclusion that the evidence was not in the possession, custody, or control of military authorities was not clearly unreasonable or erroneous.

### c. Production of Evidence and Witnesses

Appellant raises several claims regarding the production of the evidence and witnesses beyond what has been described above. First, Appellant claims the military judge "should have rectified" an Article 46, UCMJ, "unlawful inequity by ordering the Government to produce the witnesses for trial or pretrial interviews." This argument fails here for the same reasoning we described above. We see no Article 46, UCMJ, inequity that should have been corrected by the military judge as the parties' access to the McKinney police was substantially the same. Regarding pretrial interviews, the military judge rejected a request to order pretrial interviews noting "no party is entitled to compulsory pretrial interviews"—a conclusion that is not clearly erroneous or unreasonable. *See United States v. Alston*, 33 M.J. 370, 373 (C.M.A. 1991). Additionally, we see no efforts by trial counsel that attempted to impede the Defense's access to evidence or witnesses.

Second, Appellant claims the Government should have subpoenaed the requested information, citing Tex. Gov't Code Ann. § 552.0055 that a subpoena duces tecum issued in compliance with a rule of criminal procedure is not a "request for information" like AFOSI's initial request. We need not delve into Texas statutes cited by the parties as Appellant fails to account for the responsibilities of the Defense prior to receiving the "benefit of compulsory process" under R.C.M. 703(a). Notably, in their written motion, Appellant conceded that he did not "specifically request the non-witness evidentiary items listed in this motion to compel" until the day of the written motion. The motion, dated 18 September 2018, was filed near the end of the second day of trial. It is clear to us that Appellant did not request the trial counsel to subpoena any evidence regarding KM's allegations prior to trial despite having knowledge that the Government sought to admit KM's testimony and the Defense had moved to

exclude it. Further, according to R.C.M. 703(f)(3), Appellant "shall list the items of evidence to be produced and shall include a description of each item sufficient to show its relevance and necessity, a statement where it can be obtained, and if known, the name, address, and telephone number of the custodian of the evidence." Even after receiving six hours to compose a written motion, the Defense did not include this information and instead requested an additional two-day continuance to "gather subpoenas for the listed witnesses and the other evidence listed." We find no abuse of discretion when the military judge determined the Defense failed to articulate a basis for "relevance and necessity" under R.C.M. 703(f)(1) and (3) and denied their request to produce evidence via subpoena.

Appellant also claims his Sixth Amendment right to confront KM was impacted by the military judge's ruling and the need to challenge KM's credibility, trustworthiness, and reliability were sufficient to show evidence and witnesses were relevant and necessary under R.C.M. 703(f)(3). We are not persuaded. Appellant has not shown, at trial or before us, what additional cross-examination questions would have been asked of KM had additional evidence or witnesses been produced. Application of R.C.M. 703 did not deny Appellant the right to compulsory process and relevant witnesses under the Sixth Amendment but "simply allow[ed] for judicial review of denial of subpoenas on relevance and materiality grounds before they are enforced by court order." *See United States v. Breeding*, 44 M.J. 345, 355 (C.A.A.F. 1996) (Sullivan, J., concurring in the result).

Regarding the requested witnesses, the military judge found the Defense's request for production "to be nothing more than a list of every investigator" of KM's allegations. The military judge referenced the need for a synopsis of testimony under this rule and that "[n]o such synopsis has been provided." We have weighed the factors from *McElhaney* including the timeliness of the request and that the witnesses were for the merits to address a challenge to the credibility and reliability of a Mil. R. Evid. 413 witness. *See* 54 M.J. at 127. We also considered the absence of any summary of their proposed testimony before the trial court or us. We see no clear error of judgment by the military judge as he cited the relevant factors and *McElhaney* prior to denying the request to produce witnesses.

### d. Did the Evidence Tend to Be Exculpatory?

The military judge concluded the Defense had "failed to show how any of the requested evidence is actually exculpatory" and that a presumption that the evidence would be exculpatory is not the standard. The military judge determined "nothing in the summary of the investigation or in the multiple interviews of [KM] . . . demonstrated the evidence sought by [the] [D]efense would be exculpatory. This [c]ourt will not presume or guess that evidence is

exculpatory." Before us, Appellant argues the military judge was incorrect when he concluded there was "nothing" exculpatory and again refers to KM's statement regarding DNA being found on her clothes and on the swabs in her SAFE kit. Appellant argues this evidence "clearly was exculpatory" and "would have negated or reduced [Appellant's] degree of guilt with respect to [KM]'s allegations."

As a threshold matter, we note that R.C.M. 701(a)(6) addresses favorable evidence that would negate or reduce the degree of guilt to a charged offense or reduce the punishment. So, to the extent Appellant referenced a concern about a "degree of guilt" with KM's allegations, his concern is misplaced as he was not ever charged with committing an offense against KM so no degree of guilt regarding KM is involved in the inquiry. Still, we conclude that impeachment evidence related to KM, as a Mil. R. Evid. 413 propensity witness, would be material to Appellant's guilt or the punishment of the charged offenses under *Brady*, *Strickler*, and *Claxton*. *See* 373 U.S. at 87; 527 U.S. at 280; 76 M.J. at 359.

But Appellant has provided us little more than speculation regarding the impeachment evidence regarding KM that was withheld from him but was known to the trial counsel or other Air Force lawyers who advised on Appellant's investigation and prosecution. As the United States Court of Military Appeals once observed, "[g]enerally, the production of [*Brady*] evidence is required and reversal mandated where, after trial, such information is discovered which was known to the prosecution but which was unknown to the defense." *United States v. Lucas*, 5 M.J. 167, 171 (C.M.A. 1978). Appellant references KM's statements to AFOSI regarding DNA being found and those statements being wrong. But the Defense was permitted to ask cross-examination questions of KM regarding why she said her DNA was found and to offer a theory of admissibility once she testified. Once KM testified that she was not 100% sure what was found and that she only heard about results through her parents and not through investigators or hospital staff, the civilian defense counsel agreed to move on rather than propose a theory of admissibility. Even if this cross-examination had been admitted, we see it adding little to KM's impeachment. KM was extensively challenged on her lack of memory, inconsistencies, the physical positions of her and Appellant, and that she never went to court in Texas to testify against Appellant. Additionally, the Defense's closing argument addressed the absence of the SAFE report, that the McKinney police did not interview Appellant, and he was not prosecuted. The Defense argued these showed "something in those items of evidence that kills her story" or "proves that it was consensual." Appellant makes similar broad pronouncements before us.

Regarding the SAFE report, we acknowledge that we often see prior inconsistent statements in the narrative provided by a victim which differs from statements made to law enforcement, to lawyers in pretrial interviews, and in trial testimony. But Appellant did not call KM to testify on the motion and did not show what she said during her SAFE which could then be compared to what she told the McKinney police, the AFOSI, or the defense team during their pretrial interview of her. The Defense did not present evidence that KM remembered the SANE taking notes or typing verbatim what KM said. The Defense did not present any form that the hospital used to show that a narrative would have been obtained. Finally, the Defense did not present evidence of inconsistent statements to KM's best friend, whom she first reported to and whose name was in the AFOSI's summary, to show that it was more likely that inconsistent statements were made to the SANE.

Our standard of review is not whether other military judges would have ordered the Government to obtain the SAFE report or even whether it is possible that the SAFE report may contain prior inconsistent statements. Instead, it is whether the military judge abused his discretion when he concluded the Defense had failed to show how any of the requested evidence was exculpatory. We find no abuse of discretion under the circumstances of this case. We see no "recklessly cavalier approach to discovery" from the trial counsel that resulted in a "critical failure[ ] to produce exculpatory evidence." *Stellato*, 74 M.J. at 482 (footnote omitted). We see no systematic ignoring of R.C.M. 701 discovery obligations. During the six-hour delay in the case while the Defense wrote its motion to compel, the senior trial counsel attempted to reach out to the District Attorney's Office as another avenue to seek information. With only limited time allotted the senior trial counsel did not hear back before argument on the motion and did not state later in the trial whether the District Attorney's Office ever called back. Appellant does not claim the senior trial counsel learned of evidence from the District Attorney's Office that tended to be exculpatory. Unlike many cases, where the prosecution works closely with a local police department, this case shows an utter lack of a relationship between the trial counsel and the entity which, at least at one time, held additional evidence regarding KM's allegations against Appellant. *See Williams*, 50 M.J. at 441.

Finally, we note that there has not been a claim that KM had any of the evidence, like a copy of the SAFE report or a copy of the CD of photographs. Therefore, we see no willful ignorance by the trial counsel of evidence that reasonably tends to be exculpatory in the hands of KM. *See Stellato*, 74 M.J. at 487 (citations omitted). Like the military judge, we see the circumstances of this case to be vastly different than *Stellato* and we conclude there was no abuse of discretion by the military judge in denying the defense motion. As we determined the evidence and witnesses at issue were not subject to disclosure, discovery, or production, we do not reach the second question and test the effect

of nondisclosure or a failure to produce a witness on Appellant's trial. *See Coleman*, 72 M.J. at 187.

### E. Mil. R. Evid. 412

#### 1. Additional Background

After Appellant was permitted to withdraw his plea to battery of Amn MM, the defense counsel orally moved for a continuance citing a need to obtain evidence of Amn MM's sexual practices with other men that the Defense argued would be admissible under Mil. R. Evid. 412. The Defense cited its earlier Mil. R. Evid. 412 motion and provided an additional email from one male Airman who would testify that his sexual experiences with Amn MM included biting, choking, and scratching.[37] Appellant testified in a closed session that he learned this information from the other male Airman about a week and a half before the charged incident where he slapped Amn MM in the face. Appellant also testified that he thought Amn MM might enjoy being slapped in the face "because of the previous stuff I've heard before" and because of his previous sexual history with Amn MM.

The military judge ruled the testimony of other Airmen was not constitutionally required under Mil. R. Evid. 412(b)(3) and excluded it. As described in the legal and factual sufficiency section, the military judge had already admitted evidence of the nature of prior sexual encounters between Appellant and Amn MM. *See* Mil. R. Evid. 412(b)(2). The military judge permitted Appellant to testify that Amn MM asked him to smack her in the face and for the Defense to cross-examine Amn MM on this point. The military judge denied the continuance request.

After the ruling, Appellant testified that Amn MM asked him to slap her before and he did so in a prior sexual encounter. He also testified that he thought slapping was "something she was into." Upon recall, Amn MM testified, as we described above, that she told Appellant before that her face was off-limits.

On appeal, Appellant asserts an abuse of discretion because the military judge erroneously determined that the evidence was "marginally relevant" and that there were disparities between the sexual acts of the other male Airman and Appellant with Amn MM. Appellant advances a theory that Amn MM's "unusual and distinctive" sexual pattern supported Appellant's testimony that

---

[37] The trial transcript, appellate exhibits, and briefs addressing this excluded evidence were sealed pursuant to R.C.M. 1103A. These portions of the record and briefs remain sealed, and any discussion of sealed material in this opinion is limited to that which is necessary for our analysis. *See* R.C.M. 1103A(b)(4).

Amn MM asked him to slap her in the face before and his belief that she "would enjoy a strike to the face." The Government responds that there was no error, and if there was error, it was harmless beyond a reasonable doubt. We disagree with Appellant and find no abuse of discretion.

**2. Law**

"We review a military judge's decision to admit or exclude evidence for an abuse of discretion." *Erikson*, 76 M.J. at 234 (citation omitted). The application of Mil. R. Evid. 412 to proffered evidence is a legal issue that appellate courts review de novo. *United States v. Roberts*, 69 M.J. 23, 27 (C.A.A.F. 2010) (citation omitted).

Mil. R. Evid. 412 provides that, in any proceeding involving an alleged sexual offense, evidence offered to prove the alleged victim engaged in other sexual behavior or has a sexual predisposition is generally inadmissible, with three limited exceptions, the third of which is pertinent to this case. The burden is on the defense to overcome the general rule of exclusion by demonstrating an exception applies. *United States v. Carter*, 47 M.J. 395, 396 (C.A.A.F. 1998) (citation omitted).

The third exception under Mil. R. Evid. 412 provides that the evidence is admissible if its exclusion "would violate the constitutional rights of the accused." Mil. R. Evid. 412(b)(1)(C). Generally, evidence of other sexual behavior by an alleged victim "must be admitted within the ambit of [Mil. R. Evid.] 412(b)(1)(C) when [it] is relevant, material, and the probative value of the evidence outweighs the dangers of unfair prejudice." *United States v. Ellerbrock*, 70 M.J. 314, 318 (C.A.A.F. 2011) (citation omitted).

**3. Analysis**

In his ruling, the military judge cited appropriate caselaw and made findings of fact. Only his ultimate conclusions are challenged on appeal. The military judge concluded the testimony of the other Airman was "marginally relevant." The military judge determined that "[t]he acts described are different, both in timing and in form from what is alleged that [Appellant] did in this case [to Amn MM]" and "[b]iting, choking, and scratching during sex are different than a smack to the face as a method of arousal." None of these conclusions are an abuse of discretion.

Relevance is a "low threshold." *Roberts*, 69 M.J. at 27. Evidence is relevant if it has any tendency to make the existence of a fact more probable or less probable than it would be without the evidence. Mil. R. Evid. 401(a). Trial defense counsel argued Amn MM had a "crenulation towards rough sex" that would make Appellant's mistake of fact defense stronger given that Amn MM mumbled something before Appellant struck her. The evidence met the low relevance threshold as it did have a tendency to show that Appellant may have

had an honest mistake of fact and the other Airman's comments may have been a source that contributed to it.

Materiality is a "multi-factored" test looking at the importance of the issue for which the evidence was offered in relation to the other issues in the case; the extent to which the issue is in dispute; and the nature of the evidence. *Ellerbrock*, 70 M.J. at 318. The other Airman's testimony lacked materiality based on the nature of the testimony. The other Airman was not going to testify that Amn MM's prior sexual practices included being slapped in the face, only that different sexual practices such as biting, choking, and scratching had occurred. Further, there was no indication that the other Airman would support Appellant's claims that he had slapped Amn MM before during sex and that Amn MM said "strike me" during the charged incident. Additionally, the proposed testimony did not contribute in any positive way to whether the belief that Appellant may have held was reasonable under the circumstances. It may have done the opposite as a reasonable person would not rely upon a report from another person to determine consent.

Further, as the military judge noted, there was already testimony before the court of the past sexual practices of Amn MM and Appellant which were more material. The military judge broadly described this evidence as "Amn MM enjoys or participates in aggressive sex" before stating that this conclusion was the only thing that the other Airman's testimony could offer.

Even if the evidence is relevant and material, it must be admitted only when Appellant can show that the probative value outweighs the dangers of unfair prejudice. *See* Mil. R. Evid. 412(c)(3). Those dangers include *inter alia* harassment or interrogation that is repetitive or only marginally relevant. *Ellerbrock*, 70 M.J. at 318 (citation omitted). The military judge's ruling concluded that the evidence added little to what was before the court, an indication of how repetitive it was. We agree that the Airman's testimony would have been cumulative and added very little to the Defense's case. For the most part, Amn MM did not dispute the prior sexual practices she had engaged in with Appellant. The only serious dispute was whether slapping in the face was part of those prior practices or was expressly forbidden. The other Airman's testimony did not assist on this disputed matter. We conclude this other Airman's testimony, while relevant, lacked materiality and Appellant did not show that its probative value outweighed the dangers of unfair prejudice because the evidence was harassing to Amn MM, repetitive of evidence before the court, and only marginally relevant. The evidence was not constitutionally required. Therefore, the military judge did not abuse his discretion by excluding evidence of Amn MM's sexual practices beyond those between Amn MM and Appellant.

Assuming *arguendo* that there was error in excluding the evidence, we find it harmless beyond a reasonable doubt because the verdict would not have

changed if the evidence was admitted. The evidence was only marginally relevant as it did not involve slapping of the face and provided only scant support to a theory of consent to the charged battery or the abusive sexual contact. Additionally, it did not positively contribute to whether a mistake of fact—if honestly held by Appellant—would be reasonable under the circumstances. The Government's case was very strong. The Defense elected to put on a findings case regarding Amn MM which did little to weaken the Government's case as it relied largely on Appellant's contradictory versions of what happened. If admitted, the military judge would not have received a different impression of the evidence or Amn MM. Therefore, if there was error, it was harmless beyond a reasonable doubt.

## F. Ineffective Assistance of Counsel

### 1. Additional Background

Appellate defense counsel raises three grounds for ineffective assistance of trial defense counsel in that Appellant's counsel: (1) failed to provide evidence to support Appellant's mistake of fact as to consent defense to AB EA's allegations; (2) failed to rebut testimony of a government witness, A1C BD, to whom Appellant purportedly confessed to raping AB EA; and (3) failed to adequately prepare a sentencing witness, AJ—Appellant's mother—for her testimony.

Our court ordered Appellant's civilian defense counsel, Mr. JE, and his military defense counsel, Major (Maj) BH, to provide responsive declarations.[38] We have considered whether a post-trial evidentiary hearing is required to resolve any factual disputes between Appellant's and AJ's assertions and the trial defense counsel team's assertions. *See United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997); *DuBay*, 37 C.M.R. at 413. We find a hearing unnecessary to resolve Appellant's claims.

### 2. Law

The Sixth Amendment guarantees an accused the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). In assessing the effectiveness of counsel, we apply the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence announced in *United States v. Cronic*, 466 U.S. 648, 658 (1984). *See Gilley*, 56 M.J. at 124 (citing *United States v. Grigoruk*, 52 M.J. 312, 315 (C.A.A.F. 2000)). We review allegations of ineffective assistance de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *Mazza*, 67 M.J. at 474).

---

[38] An additional declaration was provided to the court from the defense paralegal but we do not find it necessary to consider its contents.

We utilize the following three-part test to determine whether the presumption of competence has been overcome:

> 1. Are appellant's allegations true; if so, "is there a reasonable explanation for counsel's actions"?

> 2. If the allegations are true, did defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers"?

> 3. If defense counsel was ineffective, is there "a reasonable probability that, absent the errors," there would have been a different result?

*Id*. (alterations in original) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)). The burden is on the appellant to demonstrate both deficient performance and prejudice. *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citation omitted).

"Defense counsel do not perform deficiently when they make a strategic decision to accept a risk or forego a potential benefit, where it is objectively reasonable to do so." *Id*. (citing *Gooch*, 69 M.J. at 362–63) (additional citation omitted). In reviewing the decisions and actions of trial defense counsel, this court does not second-guess strategic or tactical decisions. *See United States v. Morgan*, 37 M.J. 407, 410 (C.M.A. 1993) (citations omitted). It is only in those limited circumstances where a purported "strategic" or "deliberate" decision is unreasonable or based on inadequate investigation that it can provide the foundation for a finding of ineffective assistance. *See United States v. Davis*, 60 M.J. 469, 474 (C.A.A.F. 2005).

**3. Analysis**

We find each of the claims of ineffective assistance of counsel to be without merit.

### a. Mistake of Fact as to Consent – AB EA

Appellant's first claim centers on a failure to elicit evidence that AB EA had a "crush" on Appellant or use such evidence to challenge AB EA. Appellant argues this was "clear error" and would have lent support to his mistake of fact as to consent defense. Appellant argues that his wife, A1C PC, was ready to testify about AB EA's "crush" on him and A1C PC provided a declaration to this effect. On appeal, Appellant also argues another friend, Amn CH, could have testified similarly to A1C PC. Finally, before us, Appellant declares that he "knew [AB EA] had a crush on [him]."

Maj BH conducted the direct examination of A1C PC and elicited that Appellant and AB EA acted as if they were close friends. On cross-examination

A1C PC confirmed Appellant and AB EA were close friends. The ultimate question of whether AB EA had a "crush" on Appellant was not asked of A1C PC.

In her declaration, Maj BH explained that the defense team made a strategic decision not to ask A1C PC the ultimate question about a "crush." The Defense believed most of the flirting between AB EA and Appellant took place after A1C PC left technical training and moved to her first permanent duty assignment. This led the Defense to question whether A1C PC had sufficient personal knowledge to give an opinion about a "crush." Further, the Defense had concerns that on cross-examination A1C PC would be forced to admit that Appellant may have also had a "crush" on AB EA or at least his actions would suggest so. We conclude the defense team provided a reasonable explanation for why A1C PC was not asked the ultimate question about AB EA having a "crush" on Appellant.

Amn CH was requested as a defense witness and traveled to the court-martial but did not testify. Amn CH provided a declaration to us that he does not know why he was never called to testify. His declaration says nothing about him telling the defense team that AB EA had a "crush" on Appellant. Maj BH's declaration shows that Amn CH was interviewed multiple times and did not relay a belief that AB EA had a "crush" on Appellant. As the defense team had no factual basis for calling Amn CH to provide an opinion about AB EA's "crush" on Appellant we find a reasonable explanation for their decision to not call him to testify on this matter.

### b. Failure to Rebut Testimony of A1C BD

A1C BD knew Appellant, AB EA, and Amn CH and was in their friend group. He did not personally know Amn MM. When A1C BD testified for the Government much of his testimony involved his terribly poor recollection of three-way phone calls between Appellant, A1C BD, and Amn CH which occurred after A1C BD heard from AB EA that Appellant had "raped" her.

In his trial testimony, A1C BD was not confident and not at all sure what Appellant said on the three-way call. He testified he could not fully and accurately testify to what Appellant said. A1C BD agreed he made an earlier written statement to AFOSI when the phone call was fresher in his mind and at the time he believed his statement to AFOSI was truthful. Without objection, A1C BD read from that statement: Appellant "later on called me and [Amn CH] into a conference call and told me he raped [AB EA] straight up," and "in the conference call [Appellant] mentioned that the situation started with consent and then later on during intercourse she told him to stop, but [AB EA] stated before the conference call that he straight up raped her with no consent at all."

On cross-examination, A1C BD explained that after he made his first written statement to AFOSI, there was another three-way phone call between him, Appellant, and Amn CH. Appellant had seen A1C BD's written statement and said, "[Y]ou lied on me. I didn't say that I raped her. We're no longer friends." After this later three-way conversation, A1C BD told one of the trial counsel that Appellant had not said that he raped AB EA, but said that he "[f]'ed up." Later in cross-examination, A1C BD admitted he had "no idea" whether Appellant ever said he raped AB EA but he was certain that AB EA told him that Appellant raped her. Finally, A1C BD admitted it was possible that Appellant told him in the first three-way conversation "I f***ed up" and that A1C BD interpreted it as him admitting he raped AB EA.

Amn CH provided a declaration that he recalled a three-way phone call with A1C BD and Appellant where Appellant said "I f***ed up." Amn CH recalled asking how and Appellant answering that "he cheated on his wife," A1C PC. Amn CH denied Appellant said anything about raping AB EA.

Maj BH's declaration explains that the Defense initially expected Amn CH to testify consistent with his post-trial declaration. This is why he was on the defense witness list and was traveled for the trial at government expense. However, when the Defense interviewed him before trial, Amn CH was no longer adamant that Appellant did not confess and could not really remember what was said since it happened so long ago. According to Maj BH, Amn CH also disclosed new information to the defense team that we need not detail here that led the defense team to make the strategic decision not to call him to the stand as the risk far outweighed the benefit.

We conclude that trial defense counsel's explanation for not calling Amn CH was reasonable under the circumstances and based on proper investigation of the facts, as they could be best determined. Therefore, we do not second-guess this strategic decision. Before us, appellate defense counsel would balance the risk of having Amn CH testify differently and find it objectively unreasonable as Amn CH's testimony would have been "crucial to the Defense" and that A1C BD's testimony was "extremely harmful." Of course, the first presumption in this argument is that Amn CH would have testified consistently with his declaration to us rather than what he told Maj BH prior to trial. Even if Amn CH would have testified in that manner, we see A1C BD's testimony quite differently than appellate defense counsel. We did not rely on A1C BD's testimony in determining legal and factual sufficiency of the convictions involving AB EA because it was inconsistent and unreliable. Having successfully blunted A1C BD's testimony with effective cross-examination, the defense team's decision to decline to call Amn CH as a witness when he could have reversed what was gained during cross-examination of A1C BD was objectively reasonable.

### c. Failure to Prepare AJ to Testify in Sentencing

Appellant's mother, AJ, provided a declaration to this court in which she states,

> [I] never sat down with [Appellant's] attorneys to prepare for my testimony or to discuss what questions they would ask. We also never discussed what I should not say. Instead they told me that they just ask about how [Appellant] was raised. That was all the information and preparation they gave me.

Mr. JE recalled speaking with AJ on more than one occasion prior to trial and discussing her testimony during the trial. Mr. JE noted that Maj BH dealt the most with AJ as they had developed a rapport from their frequent conversations. Mr. JE recalled discussions with Maj BH on how limited AJ's testimony would have to be to avoid opening the door to rebuttal evidence in the form of newly discovered evidence known to the Defense that had the ability to hurt Appellant's case. Mr. JE recalled AJ being prepped further during the military judge's deliberations. Mr. JE declared this lasted for "over an hour" where Maj BH and the defense paralegal "went over [AJ's] testimony in great detail." After Appellant was convicted the defense team spoke with AJ before the sentencing portion of the trial to make sure she remembered what had been discussed with her and to answer any last-minute questions. Mr. JE recalled AJ expressing disbelief with the convictions and he was concerned whether she would be able to keep her composure. Mr. JE noted AJ was the only person who could testify about Appellant's upbringing and tragic personal history and that Maj BH "went over appropriate testimony with [AJ] and was reassured this was something she could handle." Maj BH declared that AJ "assured me she could handle herself on the stand if need be." Mr. JE recalled Appellant advocating for AJ to speak on his behalf. Mr. JE explained that despite the preparation, AJ opened the door to damaging evidence and apologized afterwards.

Maj BH's declaration is consistent with Mr. JE's. Maj BH explained she did not tell AJ the exact questions she would ask as Maj BJ wanted the answers to be authentic but they did discuss the general topics, including the story of AJ gaining custody of Appellant and his upbringing, and her testimony would be limited as there was new evidence that could possibly hurt her son's sentencing case. Maj BH recalled speaking to AJ four times, twice before trial, once during findings deliberations, and then after the verdict. Maj BH was hesitant to call AJ to the stand when they met during deliberations as AJ had an outburst from the gallery while court was in session. However, AJ "assured" Maj BH that she "could handle herself on the stand if need be, but [AJ] was certain her son would be found not guilty." After the conviction, Maj BH recalled AJ expressing disbelief with the verdict and being visibly upset. Maj BH

spent an hour calming AJ down and talking about the plan for her testimony the next day. Maj BH went over appropriate testimony so AJ would not impeach the verdict or open the door to damaging rebuttal evidence. Maj BH declared AJ was "fully prepped" and knew "what subjects were going to be covered and knew what things she could not say" but when "on the stand, [AJ's] emotions got the better of her and she unfortunately opened the door to evidence that was damaging" to Appellant. Maj BH also recalled AJ apologizing after her testimony because AJ "knew better" but was "overcome with anger" while she was on the stand.

The beginning of AJ's testimony was effective and powerful. According to AJ, Appellant was born addicted to crack cocaine as his biological mother was a drug user and drug dealer. His biological father was also a drug dealer. When Appellant was less than a month old, his biological mother brought him into a crack house, which re-exposed him to the drug and only after AJ's intervention was he taken to the hospital for drug treatment. AJ described the withdrawal symptoms that Appellant experienced, the medications he had to take, her efforts to comfort him, and long-term effects that Appellant, his siblings, and step-siblings suffered from the actions of his biological parents. AJ explained a harrowing process of caring for Appellant and coping with threats that Appellant's biological father made to kill her and Appellant. Eventually, she escaped to Texas from Buffalo, New York and raised Appellant with her husband.

After AJ described some of the impact of Appellant's investigation, Maj BH asked "have you seen a change in your son since this has come about, in his demeanor or the way he acts?" AJ answered "I have. He—He's a different person. Since meeting and marrying [A1C PC], he is really a different person. So—but, I mean, he's more loving." After some additional comments about Appellant being loving to his family, AJ continued, "He's always cared about everybody, and I never could imagine him hurting anyone ever. He's never done anything—nothing like this. This is out of his character. He's never been in trouble. This is—this is just ludicrous to me. I don't understand." After a trial counsel objection that AJ was impeaching the verdict which the military judge said, "I don't think she was, but to the extent she was, I'm not considering it for that purpose." AJ, without a further question from Maj BH, added "He's never done anything ever." Maj BH continued her questioning eliciting favorable information regarding Appellant's age, his family, and that he was going to be a totally different person after this.

In rebuttal to AJ's testimony and other character statements admitted as defense exhibits, the Government admitted, over defense objection, excerpts from another AFOSI investigation of Appellant for abusive sexual contact of a third female technical training student, A1C SP. AFOSI completed this investigation of Appellant a little more than a month before trial on 16 August 2018.

The excerpt contained a summary of A1C SP's victim interview about an incident with Appellant in her dormitory room in the building where she and Appellant lived. The AFOSI interview of A1C SP was conducted on 30 May 2018 and the incident occurred in late September or early October 2017. Before the Government's rebuttal evidence was offered, the Defense had requested the rules of evidence be relaxed prior to admission of the defense sentencing exhibits and the military judge granted that request as to hearsay, authentication, and foundation.

The AFOSI excerpt described an incident where Appellant kissed A1C SP and placed his hands on her breasts and buttocks over her clothing, without her consent, and grabbed her by the wrist and placed her hand on his erect penis. The excerpt indicated that A1C SP's dorm room door was open when this occurred. Based on the dates in the excerpt, the incident involving A1C SP was after the charged offenses against Amn MM, but before the charged offenses against AB EA. The incident also appeared to be about a month or less before Appellant's marriage to A1C PC.

While AJ's declaration is facially adequate to raise a lack of preparation by the trial defense counsel, the record as a whole compellingly demonstrates the improbability of those facts, so we have discounted those factual assertions and will decide the legal issue before us. *See Ginn*, 47 M.J. at 248. First, the record of trial shows that at two points in the trial the military judge instructed the spectators to refrain from having outbursts or otherwise showing an inability to control their emotions. These instructions occurred immediately before findings were announced and the next day shortly before AJ testified. The transcript makes clear that AJ approached the witness stand from the gallery which demonstrates that she observed at least parts of the trial. We find these portions of the record lend support to the defense team's recollections of AJ having difficulty with retaining her composure in light of the verdict.

The content of AJ's testimony definitively demonstrates that she lost her composure. The question asked by Maj BH related to how Appellant had changed. AJ's answer was mostly nonresponsive and addressed how Appellant had always cared about everybody, had never done anything like this, that this was out of character, ludicrous, and something she could not understand. The words used by AJ lend credibility to the defense counsels' assertions that they had concerns about calling her as a witness given her emotional state, a matter which is not addressed in her declaration.

But the fact that the defense team had legitimate concerns about whether AJ could control her emotions on the stand that proved to be warranted does not mean that the trial defense team provided ineffective assistance of counsel. Trial defense counsel made a deliberate decision to take a calculated risk in

calling AJ to testify. That decision did not work out as planned but undoubtedly AJ still provided meaningful and helpful testimony in other areas. We cannot say the decision by the Defense to call AJ was unreasonable or based on inadequate investigation. We also cannot see how more preparation of AJ would have rectified her emotional state post-verdict. The question was not particularly challenging to answer and AJ's answer was mostly nonresponsive. In his reply brief, Appellant suggests a written statement or affidavit would have been a better choice. Such a suggestion is made with the benefit of hindsight and is the type of second-guessing that we do not engage in when there is proper investigation and a reasonable strategic decision to accept a risk.

Even if AJ's declaration is accurate and the trial defense counsel failed to properly prepare her sufficiently, we find that their performance did not fall measurably below that ordinarily expected of fallible lawyers. The defense team expected that AJ would be up to the task of providing responsive answers to the questions asked, AJ assured them that she could handle testifying, and Appellant wanted AJ to testify. AJ's declaration does not contradict any of these points. The defense counsel took a risk and it is one that we believe other defense lawyers would have taken knowing the powerful evidence about Appellant's upbringing that AJ could and did provide. We evaluate trial defense counsel's performance not by the success of their strategy, "but rather whether counsel made . . . objectively reasonable choice[s] in strategy from the alternatives available at the [trial]." *See United States v. Dewrell*, 55 M.J. 131, 136 (C.A.A.F. 2001) (quoting *United States v. Hughes*, 48 M.J. 700, 718 (A.F. Ct. Crim. App. 1998), *aff'd*, 52 M.J. 278 (C.A.A.F. 2000)). Appellant has failed to overcome the strong presumption that counsel's performance was within the wide range of reasonable professional assistance.

Finally, we address whether there was a reasonable probability that, absent the error, there would have been a different result. Appellant does not claim his counsel were ineffective by offering character statements on his behalf. Yet it is clear from the military judge's ruling that the rebuttal evidence was admitted because of AJ's testimony and portions[39] of the character statements. Appellant has not shown that the rebuttal evidence would have been rejected even if AJ's testimony had not gone astray. Further, when the military judge ruled on the admissibility of the excerpt regarding A1C SP, in conducting a *sua sponte* Mil. R. Evid. 403 balancing test, he noted he would only use this evidence "for the narrow purpose" to "explain or repel, counteract, [or] assist me in placing context" the character letters and the testimony of AJ and that he had "no concerns" that he would confuse this with the charges of which he

---

[39] For example, one character letter stated that Appellant "is big on respect for all human beings, but especially women."

convicted Appellant or that it was unfairly prejudicial. Appellant was convicted of serious charges involving two victims. We cannot say that there is a reasonable probability of a lower sentence if the testimony of AJ was not presented or if the Defense had only offered a written statement from AJ. Therefore, we find Appellant has failed to demonstrate either deficient performance by his counsel or prejudice. *See Datavs*, 71 M.J. at 424 (citation omitted).

## G. Post-Trial Delay

Appellant's case was docketed with this court on 7 February 2019. Appellant filed his assignments of error brief almost a year later on 3 February 2020 after his counsel requested and was granted nine enlargements of time to file his brief. Of the nine requests by counsel, Appellant explicitly consented to the last four. The Government opposed each of Appellant's requests.

We granted one extension of time to the Government which permitted it to file an answer brief 30 days after the receipt of the declarations we ordered from Appellant's trial defense team. Appellant did not oppose this extension of time. On 20 April 2020, the Government timely filed its answer brief. Appellant timely filed his reply brief on 27 April 2020.

"We review de novo claims that an appellant has been denied the due process right to a speedy post-trial review and appeal." *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (citations omitted). In *Moreno*, the CAAF established a presumption of facially unreasonable delay when a Court of Criminal Appeals does not render a decision within 18 months of docketing. 63 M.J. at 142. Where there is such a delay, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): (1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of his right to a timely review; and (4) prejudice to the appellant. *Moreno*, 63 M.J. at 135 (citations omitted). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id*. at 136 (citing *Barker*, 407 U.S. at 533).

However, where an appellant has not shown prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). In *Moreno*, the CAAF identified three types of cognizable prejudice for purposes of an Appellant's due process right to timely post-trial review: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of the appellant's ability to present a defense at a rehearing. 63 M.J. at 138–39 (citations omitted). In this case, we find no oppressive incarceration nor impairment of the Defense at a rehearing because Appellant has not prevailed in his appeal. *See id*. at 140. As for anxiety and concern, the CAAF has explained "the appropriate test for the

military justice system is to require an appellant to show particularized anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision." *Id.* Appellant has articulated no such particularized anxiety in this case, and we discern none. To the contrary, Appellant explicitly consented to the last four enlargements of time, which we find is some indication that Appellant understood that his appellate counsel required additional time to thoroughly address each assignment of error.

Where, as here, there is no qualifying prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *Toohey*, 63 M.J. at 362. We do not find such egregious delays here. The record of trial includes eight volumes plus an additional appellate volume as the filings are voluminous. The proceedings took place over seven days, and the transcript is over 1,000 pages. Appellant raised a dozen issues for our consideration. Additionally, much of the appellate delay in this case is attributable to the Defense. This court is issuing its opinion within three months and one week of the *Moreno* date. Appellant has neither demanded speedy appellate review nor asserted that he is entitled to relief for appellate delay. Accordingly, we do not find the delay so egregious as to adversely affect the perceived fairness and integrity of the military justice system. *Id.*

Recognizing our authority under Article 66(c), UCMJ, 10 U.S.C. § 866(c), we have also considered whether relief for excessive post-trial delay is appropriate even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002). After considering the factors enumerated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we conclude it is not.

## III. CONCLUSION

We affirm only so much of the sentence as provides for: a dishonorable discharge, confinement for 10 years, forfeiture of all pay and allowances, and reduction to the grade of E-1. The approved findings and sentence, as modified, are correct in law and fact, and no further error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10

U.S.C. §§ 859(a), 866(c). Accordingly, the approved findings and sentence, as modified, are **AFFIRMED**.[40],[41]

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court

---

[40] The CMO contains an error that requires correction. Specification 4 of the Charge, the abusive sexual contact offense involving Amn MM, lists one phrase of excepted words as "using lawful force" when the excepted words were "using unlawful force." We order a corrected CMO.

[41] Two pages are missing from Appellant's post-trial and appellate rights advisement, a required appellate exhibit under R.C.M. 1010. Appellant does not raise a claim that the record of trial is incomplete or that he was prejudiced because pages are missing. We find the omission of these pages insubstantial and their absence does not render the record of trial incomplete. Article 54(c), UCMJ, 10 U.S.C. § 854(c); *see United States v. Davenport*, 73 M.J. 373, 376–77 (C.A.A.F. 2014); *United States v. Lovely*, 73 M.J. 658, 676 (A.F. Ct. Crim. App. 2014).